# JAMES HOLMES v. STATE.

No. A-1173.   Opinion Filed December 11, 1911.

Rehearing Denied January 23, 1912.

(119 Pac. 430.)

1.   **TRIAL—Instructions—Character of Accused.**   (a) A general instruction upon the subject of character is all that the court should give in the trial of a criminal case, and, even although a defendant may introduce evidence of a previous good character, yet, if the facts and circumstances in the case are such that such evidence could not be of benefit to the defendant, it is not error for the trial court to refuse to instruct upon this subject.

2.   **EVIDENCE—Appeal—Confessions—Harmless Error.**   (a) Where it is proven that confessions of the defendant were freely and voluntarily made, they are competent evidence against him.

    (b)   Even although the court may have erred in admitting evidence of a confession made by a defendant, yet if the defendant takes the witness stand in his own behalf, and testifies to the truthfulness of every material statement contained in said confession so erroneously introduced in evidence, such error in the admission of the confession becomes harmless, and is not ground for reversal.

3.   **TRIAL—Instructions—Meaning of Terms.**   (a) Where the court instructs the jury that, if they convict a defendant of murder, they should assess his punishment at death or imprisonment in the penitentiary at hard labor for life, as in their discretion they may see fit, the court should not attempt to define the legal meaning of the word "discretion."

4.   **HOMICIDE — Instructions — Self-Defense — Applicability to Evidence.**   (a) It is only in cases of homicide where the issue of self-defense is presented that it is necessary for the court to instruct the jury that they must view the facts and circumstances in evidence from the standpoint of the defendant as they reasonably appeared to him at the time of the homicide.

    (b)   It is only when the testimony given by the defendant presents issues upon which he might be acquitted, or upon which the offense might be reduced to a lower degree, that he is entitled to have the jury instructed upon the hypothesis that such testimony is true.

5.   **CONSPIRACY—Homicide—Parties to Offenses—Instructions—Applicability to Evidence.**   (a) For facts which did not authorize the court to instruct the jury as to the law of voluntary withdrawal from a conspiracy, see opinion.

    (b)   For facts which did not raise the issue that the fatal shot was fired after the termination of a conspiracy, see opinion.

(c)   When a conspiracy is entered into to do any unlawful act, all persons who engage therein are responsible for all that is done in pursuance of such conspiracy by any of their co-conspirators until the purpose for which such conspiracy was entered into has been fully accomplished.

(d)   The responsibility of co-conspirators is not confined to the accomplishment of the common purpose for which the conspiracy was entered into, but extends to and includes all collateral acts incident to and growing out of the common design.

(e)   Where parties enter into a conspiracy for the purpose of committing a robbery and dividing the proceeds of such robbery among themselves, such conspiracy continues and such parties are responsible for the acts of their co-conspirators incident to or growing out of such conspiracy and done in pursuance thereof, until they have divided the proceeds of such robbery.

(f)   If several persons set out in concert, whether together or apart, upon a common design which is unlawful, each taking the part assigned to him, some to commit the act, some to watch, and some to prevent surprise or to aid the escape of the immediate actors, if the crime is committed, in the eyes of the law all are guilty as principals.

(g)   Where several persons confederate together to commit the crime of robbery, and one of them is armed with a deadly weapon to be used by them in such robbery, and such robbery is in fact attempted or committed, and the party robbed or attempted to be robbed resists and calls for help, and the conspirator so armed with a pistol shoots and kills such person to silence his voice and prevent him from summoning assistance, or for any other purpose incident to such conspiracy, all of such persons so conspiring and confederating together for the purpose of robbery are alike guilty of murder.

(h)   Where parties voluntarily act together in the commission of any act which may result in death to another and such death ensues therefrom, all such parties so acting together are as guilty of murder as if they had intended the death of such party.

(i)   When the evidence in a case is such that there is no reason to believe that an intelligent and honest jury, having a due regard for their oaths, the law, and the evidence, would arrive at a given conclusion, it is not error for the trial court to decline to give the jury instructions upon the law applicable to such issue.

(j)   Before it is necessary for a trial court to instruct the jury upon an issue favorable to a defendant in any case, such issue must involve a conclusion which can be legitimately arrived at from the evidence in the case by an honest and intelligent jury.

6.     HOMICIDE—Indictment—Issues and Proof.   (a) Where an indictment or information charges a defendant with murder under the first subdivision of the statute (Snyder's Comp. Laws 1909, sec. 2268), a conviction can be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute.

(b)   Our statute defining murder was intended to simplify

the law upon this subject, and make it plain and bring it within the common understanding of the citizens of the state, and it does not prescribe a rule of pleading, but it establishes a guide to the conduct of the trial prescribing the proof requisite to a conviction.

7. **HOMICIDE — Punishment — Death Penalty.** Where the testimony clearly shows an aggravated case of murder, this court has no right to interfere with the verdict of the jury upon the ground that the death penalty should not have been inflicted.

Armstrong, J., dissents.

### ON MOTION FOR REHEARING.

8. **PUNISHMENT—Death Penalty—Statutory Provisions.** Act Cong. Jan. 15, 1897, c. 29, 29 Stat. 487 (U. S. Comp. St. 1901, p. 3620), which in certain cases abolishes capital punishment, has no application to proceedings in a state court, but is limited entirely to cases in the United States courts.

(Syllabus by the Court.)

*Appeal from District Court, Oklahoma County; W. R. Taylor, Judge.*

James Holmes was convicted of murder, and appeals. Affirmed.

On the 3d day of April, 1911, in the district court of Oklahoma county, the following verdict was returned against appellant:

"We, the jury, drawn, impaneled, and sworn in the above-entitled cause, do upon our oaths find the defendant, James Holmes, guilty of murder in the manner and form as charged in the information, and fix his punishment at death. T. D. Turner, Foreman."

On the 24th day of April, 1911, sentence of death was pronounced against the defendant by the court in accordance with said verdict. Appellant appealed.

The first witness for the state was Miss Kate O'Mara. She testified: That on the 8th day of March, 1911, she lived at 214 East Third street in the city of Oklahoma. At about 1:30 o'clock that night she heard some one coming up Third street whistling. This person then began to sing. She wondered who was singing so loudly at that hour of the night, and got up to see. By the time she had got to the window, the singer had passed. Only one per-

son was whistling and singing. Soon after this she heard some shuffling of feet on the sidewalk. That this noise was made by more than one person, and was pretty loud. She next heard a muffled scream. Soon after this she heard one shot. She looked out of the window again, and about one minute after the shot was fired she saw four persons in the street. Two were going west on Third street. One was in the center of the street, and the fourth person ran through her yard between the hydrant and the porch and ran to the alley. That she did not see these persons until about a minute after the shot was fired. That the parties had their heads down and were running, and witness was unable to recognize them. The next morning between 4 and 5 o'clock she saw a man lying out on the sidewalk. There was a large crowd there. There was a great pool of blood where the man was lying that had run down several feet on the pavement. The shot which she heard the night before was in the direction of the place where the man was lying.

H. E. Harris testified: That he lived at 220 East Third street. That on the 9th of March, 1911, about 1 o'clock at night, he heard some one singing, but did not pay any attention to it. That soon after this a noise was started up. That he first thought there were cats around the back yard, but he pretty soon discovered a man's voice or probably two men's voices. He then heard a gun shot. The windows were all down, and he could not distinguish exactly where the noise was. He got up, put on his clothes, and walked out in the back yard, and looked in his barn to see if his horse was all right, and walked around in the alley. He did not see or hear anything or anybody and the lights were out and he went back to bed. He got up about 4:30 o'clock the next morning, saw a man lying dead on the sidewalk, his pants pockets wrong side out. Blood appeared to run from the dead man's head down the street about 30 feet.

E. T. Bryan testified: That he resided at 214 East Third street in the city of Oklahoma. That about 1:30 o'clock on the night of the 8th of March he heard a shot, and soon after the shot was fired he heard running. He did not hear the running

until two or three minutes after the shot was fired. It was dark, and witness could not see any one. He got up the next morning, and found a man lying dead on the sidewalk. The man was lying between 214 and 216 East Third street. The man was shot in the left side of the head, right through the ear.

Charles Bersha testified: That about 4 o'clock on the morning of the 9th of March, 1911, he had occasion to be on East Third street in the 200 block. He saw a man lying dead on the sidewalk. The man had a wound in the left side of his head. Blood ran down from the wound something like 35 or 40 feet. That witness then phoned to the police department.

D. M. Ely testified that on the morning of the 9th of March, 1911, he saw a man lying in block 200 on East Third street in the city of Oklahoma. He identified the dead body as that of W. H. Archie. His pants pockets were turned wrong side out. The man was shot in the left side of the head. Blood ran down on the pavement about 30 feet.

B. Z. Hutchinson testified that he was acquainted with W. H. Archie during his lifetime, said Archie being in the employ of the witness, and having been in such employment for 2½ years. Witness identified the body of the dead man as that of W. H. Archie.

Charley Goodall testified: That he was acquainted with W. H. Archie in his lifetime, and occupied the same room with him. That the deceased was in the habit of carrying some money on him all of the time. That on the evening of the 8th of March, 1911, he saw him take a roll of money out of his clothes, and saw him place a roll of money in his pockets. He thought the deceased had at least $50 or $60 which was in currency. Deceased also had a watch. It was an open-faced gold case watch. Witness then identified a watch handed him as the watch that belonged to Archie in his lifetime.

Adolph Frankel testified: That he was engaged in the merchandise and loan business in the city of Oklahoma at 3½ West California street. That between 10 and 1 o'clock that day Bud Johnson, one of the parties accused of the murder of W. H.

6 Cr.—18

Archie, came into his place of business, and pawned a watch to him for $6.25. Witness here identified the watch pawned to him by the said Johnson.

G. W. Morgan testified: That he was present in Justice Hawkins' courtroom when the defendant was arraigned. That the witness heard a conversation between the county attorney and the defendant James Holmes and the other persons charged with the murder of W. H. Archie. That they told the county attorney that they were at the Alabama Hotel, and they went north from the Alabama Hotel up to Second street, and they saw a white man going east. They ran up to this white man, and one of them ran around and stuck a gun in his face, and told him to throw up, and he had his hands in his pockets, and he backed up against a post, and at that moment they grabbed him and threw him down, and, as he fell—it seems he had his money in a little tobacco sack, and it fell out on the ground—they picked it up, and there was a shot fired, and they all ran. That the defendants were all talking. That first one would start to tell how it was done and another would correct him. That the defendant Elijah Turner said he was not present when the shot was fired, but had run a little piece away, and the defendant James Holmes turned to Turner, and said: "Why, you were there with the rest of us."

L. K. Reynolds testified: That he was present in Justice Hawkins' court when the preliminary information was read to the defendant James Holmes when he was charged with the murder of W. H. Archie. That the defendant, Holmes, pleaded guilty to said charge at said preliminary trial. That all of the other defendants were present when the defendant Holmes pleaded guilty to said charge. That the witness heard all of the defendants talking about this trouble. That all of the defendants took part in the conversation. The defendant Holmes stated they got between $80 and $85 off of deceased Archie, which was divided up between Posey and Prather. That the other defendants got $5 apiece, and that Bud Johnson got the watch.

Dr. John W. Riley testified as to the nature of the wounds

on the person of the deceased, and that they were the cause of his death.

W. P. Hawkins testified: That he was a justice of the peace in the city of Oklahoma. That he heard the preliminary examination of the defendant charged with the murder of Archie on the 15th day of March, 1911. That, when the information charging the defendant with the murder of W. H. Archie was read to the defendant Holmes, he entered a plea of guilty to said charge. That, after the defendants had all pleaded guilty, the witness heard a statement made by the defendants with reference to the murder of Archie. They all stated they were there, and gave a description of what occurred. They said that, when "they got to the corner of Second and Walnut, they seen this man walking ahead of them on the east side of Walnut street between Second and Third street. As they got down about the middle of the block somewhere, they caught up with him, and Prather steps in front of him and threw the gun in his face, and told him to hold up his hands. The rest of them grabbed him. He resisted and hollered, and they got him down and took his money away from him and his watch, and, after they had done that, while they were still holding him, Prather shot him.

"Q. Do you remember anything particular that Elijah Turner said in the presence of James Holmes with reference to this charge? A. Why, Elijah Turner made a statement of his own that, when the man hollered, he ran, and he got up at the corner or just around the corner when he heard a shot fired. Q. State whether or not there was any response to that statement by either one of the defendants, and, if so, by whom? A. Well, the one with a wart or mole on his lip told him—he says, 'You was right there and holding him or helping to hold him.' That was at the time the shot was fired. Q. I wish you would look at this young man, and state to the jury whether or not that is the man that made that statement? A. That is the man that made the statement. Yes, sir."

Witness identified defendant Holmes as the person who made this statement.

Peter Biewer testified: That he was connected with the police force in the city of Oklahoma, and was assistant in the

bureau of identification. He testified that the appellant voluntarily made the following statement to him:

"He told me that he had started from the Alabama Hotel with Charlie Posey, John Henry Prather, alias Blue, and Cy Booker. This was about 8 p. m. on the night of March 8, 1911. They went north of Stiles to Eighth street, and turned east to Geary. At Eighth and Geary they run on a young white man. Blue stuck the gun under him, and he and Cy Booker went through his pockets, got about $2.15. They then came back to the Alabama Hotel, and got Bud Johnson. This was about midnight. They went up Walnut street to Second. Then in the middle of the block between Second and Third on Walnut they saw a white man going north, and Blue said, 'Let's get him,' and the white man turned on the south side of East Third street, and about the center of the block, and Prather went up in front of him, and stuck the gun on him, and told him to hold up his hands, and the man didn't do it, and kinder backed away. Q. He, who do you mean? A. James Holmes and Cy Booker and Bud Johnson and Posey grabbed him, and threw him down, and Posey searched him, and that Blue stood off and held the gun on him; that Posey searched him and taken his money. He said after he taken that money, he said, Blue put up the gun to the man's head and fired. He said, 'We'll all run.' He said, 'I ran with the rest of the boys.' They went back to the Hole on Second street. The Hole was closed, and they all went to the Alabama Hotel where they divided the money. He said he had gotten $5. Then Holmes went upstairs and went to bed. He said he saw Posey the next day, that Posey had said he had the gun; that Blue had given him back his gun, and that Bud Johnson got the watch."

The witness further testified that later in the day the defendant repeated this statement to him as above set forth; that the witness kept a memorandum of the statement made by the defendant.

Harry Stege testified that he belonged to the police department of the city of Oklahoma; that he was working in the secret service department. He stated that he heard the defendant Holmes make the following statement:

"He said they went up to Eighth and Geary, and held up a white man, Posey and Blue, Cy Booker, and himself. They got $2.15. He said that was a young white man, light complected.

well dressed. The man made no resistance. They went down to the Alabama Hotel and they got Bud. They went up Walnut street, I think Third or Second street. They seen a white man turn going on the south side of Third street, and Blue said I am going to throw the gun on him. Blue went up in front of him, put the gun on him, and told him to hold up. The man refused to do so. He resisted, and they all grabbed hold of him and threw him down, and Posey searched him, and, when Posey said he had got the money, they all let loose of him, and started to run, but in the meantime Blue was standing off a little ways with the gun, and, after Posey got the money, some of the boys started to run. He said he, Holmes, was standing right alongside of the man, when Blue went up to the man, pushed the gun into the man's head, and fired. He run away with Blue then, and he asked Blue why he wanted to kill the man after they had got his money, and the man was making no resistance. Blue said he just wanted to kill a white man anyhow. He said they went down Walnut street to the Alabama Hotel, to the Hole, that is where they went first, but it was closed, and they went back over to the Alabama Hotel. Blue had some money given him by Charlie Posey, and then he gave him $5, and they disbanded."

Shirley Dyer testified that he was chief of the secret service department of the police force of Oklahoma City. He stated that he had a conversation with the defendant Holmes with reference to the killing of the deceased, Archie, and that in that conversation Holmes stated to the witness that about 8 o'clock on the evening of March 8th himself, Cy Booker, Prather, or Blue, and Charlie Posey went north to Eighth street. There they turned and went east to somewhere near Eighth and Geary. "If I remember right, met a white man, a young fellow dressed in a light suit of clothes." That Blue shoved the gun in his face, and told him to throw up his hands. That he did, did not resist, and that he searched him ("meaning the defendant if I am not mistaken") and got $2.15.

"They then went back to the Alabama Hotel, divided the proceeds, I believe, and later they got hold of Bud Johnson, who was there at that time and went out again, went over to the Hole in the Wall. From there they went west on Second street, and they saw a white man turn east on Third on the south side, and Blue pulls out his gun (meaning John Henry Prather), and said,

'Boys, let's get him.' Blue went around in front of him, shoved the gun in his face, and the man refused to give up, and we all grabbed him and threw him down. That Posey went through the white man and got his money. That, when Posey said, 'I have got it,' that they all run. He said he was standing near the white man who had raised on his elbow getting up when John Henry Prather, alias Blue, shot him. Hollering for help, the white man was, and he saw him fall back and kick a little. That he asked Blue what he shot him for after he had stopped struggling, and he said he wanted to kill a man anyhow. They went back to the Hole in the Wall, and it was closed, and from there they went to the Alabama Hotel and that Blue, I believe it was, gave him $5 which he said he had gotten from Posey, and that he then went to bed. Said he thought Blue gave Posey back his gun. The next day he met Posey, and Posey told him that he was going to Memphis, and that Blue had given him his gun. As near as I can remember, that is about his confession."

The state then introduced the written confession of the defendant Holmes, which is as follows:

"I started from the Alabama Hotel in company with Charles Posey, Cy Booker, and John Henry Prather, alias Blue, at about 8 p. m., on the evening of March 8, 1911. We walked north, and, when we got to East Eighth street, we went east. About the corner of Eighth and Geary we met a white man. Blue had borrowed Charles Posey's pistol, a shiny barrelled 44-caliber gun, and he pushed it in the man's face, and ordered him to throw up his hands. The man made no resistance, and I and Cy Booker went through his pockets and got $2.15. He was a young man well dressed, light complected. We went down Geary to the Alabama Hotel, and got hold of Bud Johnson, and told him to come with us and get a little easy money. We then went up to Walnut street and saw a man, a white man, going north between Second and Third streets. He turned down Third street on the south side of the street. Blue pulled out his pistol, and said to us boys, 'Let's go and get him.' Blue went up to him, and shoved the gun to his head, and told him to throw up his hands. The man refused to do so, and all of us boys grabbed him, and threw him down while Blue stepped a little ways off with the pistol. Charles Posey went through his pockets and got considerable money. I don't quite know how much. When Posey said he had the money, we all started to run. I was standing right close to the white man, who was on his elbows on the ground just

getting up. He was shouting for help, and Blue, who had the pistol, pointed it at his head, and fired. I saw the man fall back and kick about a little. Then I ran with the rest of the boys. I asked Blue why he had shot the man after he had stopped struggling, and he said, 'I just wanted to kill a man, anyhow.' We went back to the Hole on East Second street, but it was closed, and so we went to the Alabama Hotel. Blue had the money which Charles Posey had turned over to him, and he gave me $5. I then went upstairs and went to bed. I think that Blue gave Charles Posey back his gun at the Alabama Hotel that night. Blue had carried it all day. I saw Charles Posey on March 11th. He said that he was going to Memphis. He showed me his gun, and said that Blue had returned it to him. Blue shot the white man about 1 a. m. in the morning of March 9th. State of Oklahoma. Oklahoma County. I, James Holmes, being first duly sworn according to law, depose, and state that I have read the above and foregoing statement and that the matters and things therein set forth are true. [Signed] James Holmes. Subscribed and sworn to before me this 12th day of March, A. D. 1911. W. R. Gorby, Notary Public. [Seal] My commission expires Jan. 6, 1913."

The state then rested.

The defendant placed several witnesses upon the stand who testified that they had known him for a number of years, and that he had the general reputation of being a quiet, peaceable, and law-abiding man. The defendant testified in his own behalf as follows:

"Well, on March 8th, me and some more boys started north from the Alabama Hotel early, about 8 o'clock in the evening. We went north on Stiles. We got up about Seventh or Eighth street. We turned east or west toward Geary. After we went middle ways of the block, we met a white man, and, when we met him, Prather, as we started, passed by him, pulled out a revolver, stuck it in his face, and told him to throw up his hands. He made no resistance, and me and another boy went through his pockets and got $2.15. Then we went back down Geary to the Alabama Hotel. We got there, and Bud Johnson was with us. Then we set around there a while, played some music around there, bought some whisky. Then we went back over to the place they call the Hole, a pool hall over on Second street; went back over there and it was closed. We stayed there a while. Then we went up Second street to Walnut. We got near to

Walnut, and we seen a man going north on Walnut. Then Prather said, 'Come on, let's get him.' We started north behind the man and overtaken him just around the corner on Third from Walnut and Third and between Stiles and Central—no; Central and Walnut. Prather walks around in front of the man, and throws the gun on him, told him to throw up his hands. He kinder backed off from him, and Posey and some more of the boys grabbed hold of him and threw him down. Prather stood off a little ways with the pistol in his hand, and the man began to yell. Posey said, 'Come on, let's let him alone.' Then we all broke and run. Prather, when I left him, Prather was still standing there over the man with the revolver, and then, as I started, I told Prather to come on away, let the man alone. He might let the gun go off accidentally. Prather was still standing there as I started on away. As I turned my back, I heard the gun fire, and I looked around, and I seen the man kinder fall back and kick a little. I broke in a run and caught up with the other boys. Posey and Turner was just a little ahead of me, and we all run down Walnut. Prather caught up with us. After we turned east on Second, I asked him did he shoot the man. He said, 'Yes.' I asked him why did he want to shoot the man. 'Well,' he says, 'just because I wanted to kill a man anyhow.' We never said any more then. We went on down. After we crossed Central, Prather and Turner and Posey were in front, and Bud Johnson and I were behind, walking along talking. They went on down to the Alabama Hotel, and me and Johnson went on down there, and they met us at the edge of the porch, and handed Bud Johnson a $10 bill to split with me, and says, 'Here is $5 apiece.' Blue had already given Turner $5 and gave Bud $10 to split with me."

*Edward A. Wagener,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *E. G. McAdams,* for the State.

FURMAN, P. J. (after stating the facts as above). First. Counsel requested the court to instruct the jury as to the objects and purposes for which they might consider the question of character evidence introduced by appellant, which was refused by the court. The refusal of the court to give this instruction was not error. A general instruction upon the subject of character was

given by the court. . This was all that should have been given on that question. While it is true that several witnesses testified that previous to the commission of this offense the appellant had the reputation of being a quiet, peaceful, and law-abiding citizen, yet, according to his own testimony, he was a highwayman and a thief. This entirely destroyed the effect of the testimony which he had introduced upon the subject of character, and, in view of his own admissions, the jury could not possibly have reached any conclusion favorable to him on this issue. If appellant had denied participation in the commission of this offense, his previous good character might have been of some value to him. But his own testimony took the question of character out of the case, and it would not have been error if the court had refused to give any instruction at all upon this subject. See *Morris v. Territory,* 1 Okla. Cr. 619, 99 Pac. 760, 101 Pac. 111..

Second. Appellant complains of the introduction in evidence of his written confession upon the ground that it was obtained from him by duress and fear. There was no testimony showing duress except that of appellant himself. His statements upon this subject were contradicted by a number of reputable witnesses. It was proven that this confession was made freely and voluntarily, and that appellant had made similar statements freely and voluntarily to a great number of persons, which statements were far more damaging to appellant than his written confession. The trial court did not err in admitting the written confession. But, even if there was error in this respect, it could not have prejudiced appellant, because, when he went upon the stand as a witness in his own behalf, he confirmed every material statement contained in the written confession.

Third. The trial court instructed the jury that, if they found the defendant guilty of murder beyond a reasonable doubt, they should assess his punishment either at death or at imprisonment in the penitentiary at hard labor for life, as in their discretion they might see fit. Counsel for appellant insists that the court should have given the jury a definition of the meaning of the word "discretion." With this contention we cannot agree.

"Discretion" is a common English word in. use in everyday life, and its meaning is well understood by all persons of ordinary intelligence. It has no special legal significance. We must presume that the jury were at least men of ordinary intelligence and were capable of understanding the English language. We feel quite sure that the jury understood the meaning of the word ".discretion" fully as well as the court or the attorneys in the case could possibly have explained it to them.

Fourth. Counsel contend that the jury should have been instructed to view the facts and circumstances of this case from the standpoint of appellant as they reasonably appeared to him at the time of the homicide, and cite in support of this position the case of *Price v. Territory,* 1 Okla. Cr. 508, 99 Pac. 157, and further contend that it was the right of appellant to have an instruction given the jury based upon the hypothesis that his testimony was true, and cite in support of this position the case of *State v. .Partlow,* 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31. It cannot be questioned but that the two cases above cited state correct principles of law, which under proper conditions should. be given in homicide cases in which the right of self-defense is presented, and where the testimony of the defendant presents a legal defense to such homicide. But these principles have no application at all to the case at bar. According to appellant's own testimony, he was the voluntary aggressor in a case of highway robbery, in the perpetration of which the homicide occurred, and no word of testimony offered in his defense presents the least excuse or justification for the crime in which he confessedly participated. Therefore, while the principles of law which are cited by counsel are correct, they are not applicable to the facts contained in this record.

Fifth. Appellant contends that the court should have instructed the jury that if the conspiracy in which appellant had engaged had terminated before the homicide was committed, or if appellant had voluntarily withdrawn from the conspiracy before the fatal shot was fired, in either event appellant would be entitled to an acquittal. Both of these contentions state correct

abstract propositions of law. The question is, Are they applicable to the evidence introduced upon the trial of this case? We do not think that the testimony in the record would have authorized the court to submit either of these issues to the jury. When a conspiracy is entered into to do an unlawful act, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their co-conspirators until the object for which the conspiracy was entered into is fully accomplished. This responsibility is not confined to the accomplishment of the common design for which the conspiracy was entered into, but it extends to and includes collateral acts incident to and growing out of the common design. According to appellant's own testimony, the purpose of this conspiracy was not accomplished until after the return of the parties to the Alabama Hotel where the money obtained by the robbery and murder was divided among them. Neither does the record raise the issue that appellant withdrew from the conspiracy before the fatal shot was fired, because, according to his own statement, he accompanied his co-conspirators to the Alabama Hotel, and there, in pursuance of such conspiracy, participated with them in the division of the money stolen. With full knowledge on his part that Prather had shot the deceased and having seen the deceased fall back and kick his feet, and knowing that after the deceased was shot he had ceased to call for help and was therefore probably dead, appellant continued to act with his co-conspirators and shared with them in the division of the fruits of their joint crime. He therefore cannot be heard to say that he had withdrawn from the conspiracy before the fatal shot was fired. It is true that appellant did testify at the trial that he had started to leave the place of the homicide before the fatal shot was fired, and that, before doing so, he had told Prather to come away and let the man alone; that the gun might go off accidentally. This might indicate a withdrawal upon the part of appellant from a conspiracy to kill Archie, but it does not indicate a withdrawal on his part from the conspiracy to rob, which alone could absolve him from responsibility for the act of Prather in killing the deceased in executing the con-

spiracy to rob. This testimony on the part of appellant was clearly an afterthought, and, even if standing by itself it did tend to constitute a defense, its falsity was so conclusively and overwhelmingly proven by the other testimony in the case that it would not have been necessary for the court to instruct upon this issue.

Miss Kate O'Mara was the first witness for the state. She testified that she heard a man passing her house whistling and singing; that she went to the window, but he had passed out of her sight; that she soon heard shuffling of feet, and heard a muffled scream, and afterwards heard a shot; that she looked out of the window again, and in about a minute after the shot was fired she saw four persons in the street, and they were running from the place the sound of the shot came from, and where the deceased was found dead. It was proven that the deceased was found immediately east of the house of this witness. Therefore, if appellant had started to leave the place where the shot was fired as he testified, before the shot was fired, the witness would have seen him as soon as she looked out of the window, and could not have seen him one minute after the shot was fired. This witness was clear that she did not see the parties running from the place until one minute after the shot was fired.

E. T. Bryan testified: That he resided at 214 East Third street. That he heard the shot fired at 1:30 o'clock. That he heard some parties running two or three minutes after the shot was fired. That the deceased was lying when found next morning between 214 and 216 East Third street. It simply cannot be true that appellant and those acting with him, except Prather, ran away from where the deceased was before the shot was fired. These disinterested witnesses testified that the running away did not take place until from one to three minutes after the shot was fired.

G. W. Morgan testified that in Justice Hawkins' courtroom he heard a conversation between the county attorney and all of the defendants as to how the homicide occurred, and he heard Elijah Turner, one of the defendants, say that he was not pres-

ent when the shot was fired, but ran a little piece away, and that appellant. James Holmes turned to Turner, and said, "You were there with the rest of us."

W. P. Hawkins testified: That he was justice of the peace in the city of Oklahoma. That he heard a conversation between the county attorney and all of the defendants in his courtroom. That the defendants were telling how Archie was killed, and that in said conversation Elijah Turner, one of the defendants, stated that he had just run around the corner when he heard the shot fired. That in response to this statement on the part of Turner appellant Holmes said, "You were right there holding him, or helping to hold him, when the shot was fired." So, even if appellant's testimony that he started to leave the place of the homicide before the fatal shot was fired, standing by itself, might tend to raise an issue favorable to him, yet the other evidence in the record conclusively shows that this is not the truth, and that appellant did not leave or attempt to leave the scene of the homicide until after the shot was fired. If human testimony is worth anything, and can be relied upon to establish any fact, no sane man can doubt but that appellant was a continuous participant in the crime committed to its final consummation. If Archie had submitted to being robbed without resistance and even after he lost his money, if he had not continued to call for help, it is probable that he would not have been murdered. The first man robbed that night made no resistance, and did not attempt to call for help, and he was permitted to go his way after the robbery was over. It is therefore safe to say that Archie would not have been killed if he had not persistently attempted to give the alarm. The only reasonable inference from all of the evidence is that the defendants did not dare to leave Archie alone, because, even if they should be able to get away with his money, his calling for help might bring assistance, and as long as he was alive, he might be able to show the direction in which the defendants had gone and secure their arrest, and thereby defeat the object of their robbery. It is therefore shown beyond all reasonable doubt that they found it necessary to murder Archie before they at-

tempted to leave him, and that Prather did this in the presence of the other defendants. So from every standpoint the court did not err in refusing to instruct the jury upon. the law of withdrawing from the conspiracy, or as to a homicide committed after the conspiracy was complete. Before it is error for the court to refuse to instruct upon any issue, there must be sufficient evidence in the record to make such issue not only possible, but also a legitimate, deduction from such testimony, and one at which an intelligent and honest jury could resasonably arrive. . When there is no reason to believe that an intelligent and honest jury, having a due regard for their oaths, the evidence, and the law, would legitimately reach a conclusion favorable to a defendant upon an issue, it is a waste of time for the court to instruct upon such supposed issue. The only effect of such an instruction would be to needlessly incumber the record, and confuse and mislead the jury, and possibly result in a miscarriage of justice.

In the case of *Starr v. State,* 5 Okla. Cr. 459, 115 Pac. 356, when discussing the law of conspiracy, Judge Doyle, speaking for this court, said:

"It is not necessary that the prosecution establish beyond peradventure that the acts, declarations, or conduct of the alleged conspirators were based upon the conspiracy or in reference to the crime charged. It is sufficient if they harmonize with, and tend to confirm, the charge of conspiracy, or show the motive for the crime. If such acts, declarations, or conduct of the alleged conspirators could not be shown, unless the motive therefor, or the connection between the same and the crime, were made undisputably clear, the range of inquiry would be very limited. It is sufficient that such acts, declarations, and conduct have an apparent or probable connection with the crime. The general rule is that where there is evidence of · a conspiracy to commit a crime, and of its subsequent commission, the prosecution may in support and corroboration thereof show acts, declarations, or . conduct of the alleged conspirators intermediate to the conspiracy and the crime which apparently recognizes the existence of the conspiracy, or reasonably indicates preparation or motive to commit the crime."

In the case of *Wishard v. State,* 5 Okla. Cr. 641, 115 Pac. 796, Judge Doyle again said: · ·

"As a general rule, in cases of conspiracy, each conspirator is criminally responsible for the acts of his confederates committed in furtherance or in prosecution of the common design, or for any act which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original purpose or design. Whether the evidence tending to prove the unlawful purpose of conspiracy is sufficient and * * * was in furtherance of the common purpose and design were questions for the jury to determine. On the other hand, every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design."

In section 40, 3 Greenleaf on Evidence, the law is stated as follows:

"If several persons set out in concert, whether together or apart, upon a common design which is unlawful, each taking the part assigned to him, some to commit the act, and others to watch at proper distances to prevent a surprise, or to favor the escape of the immediate actors, here, if the act be committed, are all in the eye of the law present and principals."

Where a conspiracy embraces not merely a series of unlawful acts, but also extends to a division of the fruits and proceeds of such acts among the co-conspirators, anything said or done by them, although after the commission of the unlawful acts, but before a disposition or division of the proceeds of such acts, is admissible evidence against all the other conspirators. See *State v. Pratt,* 121 Mo. 566, 26 S. W. 556; *Scott v. State,* 30 Ala. 503; *People v. Pitcher,* 15 Mich. 397; *State v. Grady,* 34 Conn. 118. The theory upon which such evidence is admissible is that the conspiracy does not terminate until there has been a division of its fruits or spoils. See *People v. Opie,* 123 Cal. 294, 55 Pac. 989. Conspirators are also responsible for the acts of their co-conspirators done for the purpose of escaping detection and arrest. See *State v. Thaden,* 43 Minn. 253, 45 N. W. 447. In the case of *Reeves v. Territory,* decided by the Supreme Court of the Territory of Oklahoma, and reported in 10 Okla. 195, 61 Pac. 828, Judge Hainer correctly said:

"Where several persons confederated together to commit a crime of a nature or under such circumstances as will, when tested by human experience, probably result in the taking of human life if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presumed that they all understood the consequences which might be reasonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accomplish such unlawful act. And, if death happens in the prosecution of such a common design or object, all are alike guilty of a homicide."

See, also, *People v. Brown,* 59 Cal. 352.

The Supreme Court of the State of Illinois, in the case of *Lamb v. People,* reported in 96 Ill. 73, said:

"Where the accused was present and committed the crime with his own hands, or aided and abetted another in its commission, he will be considered as having expressly assented thereto. So, where he has entered into a conspiracy with others to commit a felony, or other offense, under such circumstances as will, when tested by experience, probably result in the unlawful taking of human life, he will be presumed to have understood the consequences which might reasonably have been expected to follow from carrying into effect the purpose of the unlawful combination, and also to have assented to the doing of whatever would reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life. But further than this the law does not go."

The court further said:

"If the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence which may result in the taking of life unlawfully, every party to such agreement will be held criminally liable for whatever any of his coconspirators may do in furtherance of the common design, whether he is present or not."

The Supreme Court of Illinois, in the case of *Brennan v. People,* 15 Ill. 512, said:

"Where several persons conspire to commit a felony, and death happens in the prosecution of the common object, all are alike guilty of the homicide; that the act of one is the act of all, although some are not present when the crime is committed.

The prisoners may be guilty of murder, although they neither took part in the killing nor assented to any arrangement having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to beat or rob Story, and that he was killed in the attempt to execute the common purpose. If several persons conspire to do an unlawful act, and death happens in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them done in furtherance of the original design is, in consideration of law, the act of all."

The Supreme Court of Illinois, again, in the case of *Hannah v. People,* 86 Ill. 243, said:

"If a party, with others indicted with him, had a common design to do an unlawful act, whatever act any one of them did in furtherance of the original design is the act of all, and all are equally guilty of whatever crime is committed."

The Supreme Court of Iowa, in the case of *State of Iowa v. Shelledy,* 8 Iowa, 477, said:

"It is not error to instruct a jury in a criminal case that 'if two or more persons conspire together to do an unlawful act, and in the prosecution of the design an individual is killed, or death ensue, it is murder in all who enter into, or take part in, the execution of the design. If the unlawful act be a felony, or be more than a mere trespass, it will be murder in all, although the death happen collaterally, or beside the original design. If the unlawful act be a trespass only, to make all guilty of murder, the death must ensue in the prosecution of the design."

In the case of *Martin v. State,* 136 Ala. 33, 34 South. 205, the Supreme Court of Alabama said:

"If two or more persons conspire to do an unlawful act, and in the prosecution of a common object another person is killed, they are all alike guilty of the homicide, since each is responsible for everything done which follows incidentally in the execution of the common unlawful purpose as one of its probable and natural consequences, even though such act was not intended or within the reasonable contemplation of the parties as a part of the original design."

In the case of *Kirby v. State,* 23 Texas Ct. App. 14, 5 S. W. 166, the court said:

"Appellant and two other prisoners conspired to escape from jail, and arranged that C., who was one of them, should secure

and detain the jailer in the corridor while the escape should be effected. No understanding to kill or injure the jailer, otherwise than by his detention, was expressly proved, but the conspirators had obtained and prepared a piece of iron with which the jailer was killed by C., and it had been concealed by the appellant the morning previous to the homicide. C. killed the jailer in the corridor of the jail, and whilst the appellant and the other prisoner were locked up in their cell, and thus disabled from assisting C. in the homicide. There was no proof that appellant by word or gesture encouraged C. to kill the jailer. *Held,* that on this state of case the question arises whether the appellant was a principal in the homicide, and the test of that question is whether he and C. acted together, and whether the act was done in pursuance of a common design and purpose wherein their minds had agreed. It is contended for appellant that the conspiracy extended no further than the escape, and did not contemplate the killing of the jailer, or the infliction of bodily injury upon him beyond his mere detention, and that the killing was the individual and independent act of C. alone, perpetrated without appellant's knowledge or complicity, and without ability on his part to prevent it. But held, in view of the nature and object of the conspiracy, and of the preparation and use of a deadly weapon as a means to execute the common design, that the homicide was not the independent act of C. alone, but was the act of each and all the conspirators, because it was directly incident to and grew out of the common design of all. See the opinion *in extenso* on the amenability of co-conspirators for the acts of each other done in the execution of an unlawful thing."

In the body of the opinion, beginning on page 23, 23 Tex. App., on page 171, 5 S. W., the court, speaking through Presiding Judge White, said:

"According to this statement or evidence, it is clear that the parties had entered into an agreement and plan by which to effect their escape from jail, a part of which was to the method by which Cannon was to secure and detain Glazner in the corridor. It is true that appellant says nothing about an understanding that Glazner was to be killed, or even that any bodily injury was to be inflicted upon him further than his confinement or imprisonment after he had entered the jail; but as part of the plan, and doubtless, as considered by them, a most important part, they had procured and prepared for use the piece of iron with which the murder was committed, and appellant tells us that he

himself, after it was prepared, hid the same under the water-closet on the morning before it was used with such deadly effect by Cannon. If not to be used in any contingency, why prepare and hide such a weapon? Here we have established by the statement, the conspiracy to effect the escape, and the preparation of a deadly instrument to be used, it may be, only if occasion required. True, that at the very time it was used, appellant and Brown were so situated that it was impossible they could afford Cannon any direct assistance, or, in fact, do more, perhaps, than encourage him by words and gestures, even if they do so encourage him, of which fact there is no positive proof. Under such circumstances, and without direct proof of encouragement, the question is, Could appellant be held and considered in law a principal in the crime committed by Cannon? It is declared that 'all are principals who are guilty of acting together in the commission of an offense' (Penal Code, art. 74), and 'all persons who shall engage in procuring aid, arms or means of any kind to assist in the commission of an offense whilst others are executing an unlawful act' are principals (Penal Code, art. 76). And, again, any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act. (Penal Code, art. 78.) Thus it will be seen that, to render a party equally guilty and responsible with the real perpetrator, all that is required is that he be present, consenting, and that the act was the result of a common design. It is true his bare presence is not sufficient, nor is his failure to give alarm. Neither is his inactive and supposed concealment of the offense. *Burrell v. State,* 18 Tex. 713; *Truitt v. State,* 8 Tex. App. 148; *Tullis v. State,* 41 Tex. 598; *Ring v. State,* 42 Tex. 282. But such significant facts as his presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participancy may be inferred. *Id.* The true test is, Did the parties act together, and was the act done in pursuance of a common design and purpose in which their minds had agreed? *Welch v. State,* 3 Tex. App. 413; *Wells v. State,* 4 Tex. App. 20; *Scales v. State,* 7 Tex. App. 361; *Corn v. State,* 41 Tex. 301; *Smith v. State,* 21 Tex. App. 107 [17 S. W. 552]. There can be no question as to the common design and conspiracy to effect an escape from jail, and the fact is also incontestible that the murder was committed by Cannon in pursuance of this common purpose. But, while this is so, it is insisted that the conspiracy only extended to a purpose to confine Glazner

in order that the escape might be accomplished, that the evidence fails to show that appellant and Brown ever contemplated, much less agreed to, his murder or the infliction of any bodily harm upon him, and that the fatal blows dealt him by Cannon causing death were the result of an independent act upon the part of Cannon without their knowledge or concurrence, and without the ability on their part even to prevent it. "The joint responsibility of parties for each other's misconduct rests on the principle that, when an act is committed by a body of men engaged in a common purpose, such act is treated as if specifically committed by each individual. It should be observed, however, that, while parties are responsible for collateral acts growing out of the general design, they are not responsible for independent acts growing out of the particular malice of individuals. Thus, if one party of his own head turn aside and commit a felony foreign to the original design, his companions do not participate in his guilt.' (Whar. on Hom. secs. 201, 202; *Mercersmith v. State,* 8 Tex. App. 211; *Stevenson v. State,* 17 Tex. App. 619.) But it is equally as well settled that 'all combining to commit an offense to which homicide is incident are principals in homicide. As where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and in the execution of their design a murder is committed, all of the company are equally principals in the murder, though at the time of the act some of them were at such a distance as to be out of view, if the murder be in the furtherance of the common design. * * * Malice in such a killing may be inferred as a presumption of fact from the nature of the design and the character of the preparation. Whether the deceased fell by the hands of the accused or otherwise is immaterial. * * * It is only where the causes leading to the homicide have no connection with the common object that the responsibility of such homicide attaches alone to its actual perpetrator.' (Whar. on Hom. sec. 338.) As stated, we have in the evidence before us a common design to escape from jail, preparations to effect that purpose, a deadly weapon prepared as a means to be used if necessary in the accomplishment of the common purpose, the use of the deadly weapon by one of the parties in endeavoring to carry out the common design. Such a homicide, committed under such circumstances, is not a collateral, independent act of the actual perpetrator, but is the act of all, because it was an act directly incident to and growing out of the common design of all."

It will be noted that in this decision Judge White says:

"The acts of the companionship of co-conspirators, their conduct at, before, and after the commission of the act, are potent circumstances from which the participancy may be inferred."

The principle involved is that where parties voluntarily act together in the commission of an offense which may result in death to another, and such death does ensue therefrom, all such parties so acting together are just as guilty of murder as though they had intended the death of such party. The human eye cannot read the secrets of the minds and hearts of men. Therefore of necessity we must judge their intentions by the reasonable and probable results of their voluntary conduct. In other words, the law presumes that men do intend to accomplish those things which naturally and reasonably result from their actions. This is not only the law upon reason and human authority, but it is in strict harmony with the divine law. The sixteenth, seventeenth, eighteenth, nineteenth, twentieth, and twenty-first verses of chapter 35 of the Book of Numbers are as follows:

"16. And if he smite him with an instrument of iron, so that he die, he is a murderer: the murderer shall surely be put to death.

"17. And if he smite him with throwing a stone, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death.

"18. Or if he smite him with an handweapon of wood, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death.

"19. The revenger of blood himself shall slay the murderer: when he meeteth him, he shall slay him.

"20. But if he thrust him of hatred, or hurl at him by laying of wait, that he die;

"21. Or in enmity smite him with his hand, that he die: he that smote him shall surely be put to death: for he is a murderer."

So it is seen that, according to the divine law, the man or men who do things from which another may die are just as guilty of murder, and should be as severely punished, as if they had done these things intending that death should result therefrom.

Sixth.   Counsel for appellant contends that there is a variance between the allegations in the information and the testimony introduced in the trial of this cause because the information charges that the homicide was committed with a premeditated design to effect the death of W. H. Archie, while the proof fails to show ill will or hostility on the part of the defendants toward the said W. H. Archie, and that, at most, the evidence shows a conspiracy among the defendants to rob the said Archie. In support of this position, counsel for appellant relies upon section 2268 of Snyder's Comp. Laws Okla. 1909, which is as follows:

"Sec. 2268.   Murder defined.—Homicide is murder in the following cases:   (1) When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.   (2) When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.   (3) When perpetrated without any design to effect death by a person engaged in the commission of a felony."

This presents the question as to whether or not, where an information charges that the deceased was killed with a premeditated design to effect his death, a conviction can be secured where the proof shows that the killing occurred during an attempt to rob the deceased or to commit any other felony.   This question has never before been presented to this court.   The objection is purely technical, and should not be sustained unless it involves some substantial right of appellant.   Our statute does not recognize different degrees or grades or kinds of murder.   It only enumerates the class of evidence by which a murder may be proven. Where a murder has been committed, its essential character is not affected by the means by which it is accomplished.   The statute upon which counsel relies was intended to simplify, and not to complicate our criminal laws, and it is our duty to place such a construction upon it as will effect its objects and promote justice.   This we are required to do by section 2027 of Snyder's Comp. Laws Okla. 1909, which is as follows:

"The rule of common law that penal statutes are to be strictly constrdued has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

In construing penal laws, we should constantly keep in mind the fact that the supreme purpose for which they were enacted is the protection of society, and they should be given that construction which will best accomplish this result whenever it can be done without depriving a defendant of his substantial rights or working any injustice to him; and, in determining the issues presented in any case, we should always be controlled by substance rather than by form, and seek to enforce justice rather than to maintain artificial technical regularity. It is always bad pleading to state the evidence upon which the pleader relies to establish his case. It is never necessary and proper for an information or indictment to state more than the ultimate facts necessary to be proven to establish the offense. This rule is so manifestly just and so universally accepted and acted upon that it is not necessary to cite authority in its support. What are the ultimate facts in every trial for murder? First, the identity of the accused; second, the time and place where the homicide occurred; third, the means by which death was effected; fourth, the identity of the deceased; fifth, the intention with which the act resulting in death was committed. When these ultimate facts are clearly stated, they constitute every essential element of murder, and they inform the defendant of the accusation against him, and that is all that he has a right to demand in reason or under the Constitution and laws of the state. Whenever a defendant is so charged with murder in the courts of Oklahoma and the evidence brings the case within any one of the three subdivisions of section 2268, above quoted, the law has been fully complied with, and the defendant cannot be heard to complain. It will be noticed that the first subdivision of the statute includes every case of homicide, it matters not by what means or under what circumstances committed, where there was a premeditated design to effect the death of the person killed or of

any other human being. It may have been accomplished by a person engaged in the commission of a felony or doing some act imminently dangerous to others and evincing a depraved mind regardless of human life, still such homicide would come under the first subdivision of the statute, if it was the result of an act committed with a premeditated design to effect the death of some human being. The difference is that the first subdivision provides for all cases where the homicide was committed with a premeditated design to effect the death of the person killed or of some other human being, and the second and third subdivisions include cases where a premeditated design to effect the death of the person killed or of some other human being is not proven, but when the existence of such a design may be inferred from the nature of the acts done. This statute does not attempt to regulate the questions of pleading, but only undertakes to say what class of evidence is necessary to establish murder. There is no denying the proposition that the whole necessarily includes all of its several parts. Therefore, when an indictment or information charges a defendant with murder under the first subdivision of the statute, even though the state may not be able to prove as a matter of fact that the killing was done with a premeditated design to effect the death of the person killed or of some other human being, yet, if the existence of a premeditated design to effect the death of the person killed, or of some other person may be inferred from the acts in evidence, and if these acts come under, or within, the second or third subdivisions of the statute, a conviction may be had under and by virtue of either of the other provisions of the statute. The reason for this is that the greater always includes the lesser, just as the whole includes all of its necessary parts. This is in strict harmony with the common-law rule that where an indictment charges murder upon express malice, a conviction can be had upon proof of implied malice.

Placing any other construction upon this statute would only be to complicate and make more difficult and intricate the enforcement of the penal laws of this state, and thereby assist in delaying or de-

feating the enforcement of justice. We cannot understand how by this construction a defendant can be deprived of any substantial right. There are already too many loopholes for the escape of the guilty in our system of jurisprudence. In our judgment this is the prime cause for the want of respect for law and the lack of confidence in the courts which pervade our people, and also for the low esteem in which human life is held in America. We have before us the judicial statistics of England for the years 1903, 1904, 1905, and 1906, presented to both houses of Parliament by command of the king. They are, therefore, authentic public records. These statistics show for the year 1903 only 11 persons were tried for murder in the city of London. In the year 1904 only 11 persons were tried in the city of London for murder. In the year 1905 only 10 persons were tried for murder in London, and in the year 1906 only 8 persons were tried for murder in the city of London. They also show that during these years 80 per cent. of persons tried for crime in England were convicted. We have no official statistics for the United States, but according to the Chicago Daily Tribune of Saturday, December 31, 1910, on page 18, column 6, excluding suicides and lynchings during the year 1910, as reported and recorded in the papers of the various states and territories of the Union, 8,975 persons died by personal violence. We have before us the official report of the general superintendent of police of the city of Chicago, dated December 31, 1910, which shows there were 202 homicides in that city alone during the year 1910, and only one of this number was sentenced to be hanged. When we remember that London has over 7,000,000 population, and for these years it averaged less than 1 murder a month, and then compare this with the record made by Chicago, it is enough to cause the people and the courts of America to consider this matter, and discover if they can, the cause which lies at the root of the evil. It is appalling, but nevertheless true, that, while the population of London is more than four times as great as the population of the entire state of Oklahoma, yet during the year 1911 in Oklahoma county alone twice as many persons have been tried for murder as

were tried in the city of London in the year 1906. These facts should cause every intelligent and patriotic American to stop and inquire as to the cause of this disregard of law and fearful annual loss of human life. It should cause the courts to seriously consider as to whether or not the judicial system of America does not need reorganization. When a man kills another in England, the chances of his escape from punishment are exceedingly small, and the probability of his speedy prosecution and execution stares him directly in the face. It cannot be denied that this exercises a wholesome and restraining influence upon the passions of men, and results in respect for, and confidence in, the law, and consequent protection to society. It is the nearness and the certainty of punishment that strikes terror into the hearts of evildoers. The longer punishment is delayed, and the greater the opportunity for its evasion and defeat, the less efficacious it becomes as a means of deterring persons from violating the law. We inherited our criminal jurisprudence from England. The trouble is, we have endeavored to maintain it just as we received it, and we are still striving as hard as England did before the Revolutionary War to maintain technical regularity and form at the sacrifice of everything else, while, on the other hand, in England, the trial of criminal cases has been simplified, and many of the arbitrary technical rules of the common law, the effect of which was to hinder, delay, and defeat justice, have been abolished, while America keeps on using the old antequated, worn-out, secondhand, cast-off legal garments with reference to the enforcement of criminal law which England has long since discarded and thrown away. America leads the world in all departments of life, thought, and action, except in the administration of justice. While all other departments are full of progress and development, in the enforcement of justice we are largely stationary. It is time that the courts of America should act for the present and the future, and consider the past only for the purpose of avoiding the mistakes therein made. If the courts desire to enjoy public confidence and respect, they must earn it by basing their decisions alone upon

substance, and by paying more attention to justice than to shadows, form, and technical regularity.

For these reasons we cannot accept the argument made and the authorities cited by counsel for appellant in support of the proposition that there is a variance between the allegations in the information and the evidence in this case. We are glad to know that we are not without support in the conclusions at which we have arrived touching this matter. The case of *Territory v. Bannigan,* 1 Dak. 451, 46 N. W. 597, is directly in point. The statute in that then territory upon the subject of murder was identically the same as ours. The indictment in that case did not use the language of the statute, but alleged that the homicide had been committed "wilfully, feloniously, and with malice aforethought." The defendant was convicted, sentenced to death, and appealed. The court held that the Legislature had endeavored to make plain to the common understanding of the citizens of the territory, the meaning of the legal phraseology used in framing the Penal Code, and had, therefore, used the words "with a premeditated design to effect the death," etc., as equivalent to the common-law term "malice aforethought." It also held that the statute did not prescribe a rule of pleading, but establishes a guide to the conduct of the trial prescribing the proofs requisite to a conviction. The court then proceeds as follows:

"In California, murder is divided into two degrees, and defined as follows: 'All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder in the first degree, and all other kinds of murder shall be deemed murder in the second degree.' Under this statute the Supreme Court of that state has uniformly held an indictment in the common-law form sufficient, charging the offense to have been committed with 'malice aforethought.' *People v. Lloyd,* 9 Cal. 55; *People v. Dolan,* 9 Cal. 576; *People v. Cronin,* 34 Cal. 191; *People v. Martin,* 47 Cal. 101. The force of these authorities is not weakened by the consideration that the specific definition of the degrees is preceded by the general common-law definition of the crime in

the California statute. Our statute says 'homicide is murder in the following cases.' The question recurs, What is murder as here used? Being a word defined by law, it must be construed according to its legal meaning. Section 220, Crim. Proc. There-fore supplying the definition, or all that is implied in the single word, and we have in general arrangement the California statute, without the division into degrees. In the state of Pennsylvania, where murder in the first degree is defined to be 'by means of poison or lying in wait, or in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, or by any other kind of wilful, deliberate and premeditated killing,' the indictment in common-law form, charging the offense to have been committed with 'malice aforethought,' has always, 'without variableness or shadow of turning,' been held sufficient. The contrary doctrine has been held by the Supreme Courts of Ohio (*Fouts v. State,* 8 Ohio St. 98) and Iowa (*State v. McCormick,* 27 Iowa, 402), and insisted upon in a few dissenting opinions (Bacon, J., in *Fitzgerrold v. People,* 37 N. Y. 685; and Dixon, C. J., in *Hogan v. State,* 30 Wis. 442 [40 Am. Rep. 575]). Wharton, in his work on Criminal Law (vol. 2, p. 1115), says: 'According to the great weight of authority, a common-law indictment for murder is sufficient to support, under the statutes, murder either in the first degree or second degree'—citing in support of the proposition a long array of authorities, not necessary here to refer to. But it seems unnecessary to pursue the inquiry further. We have not been referred to one single authority holding a common-law indictment insufficient under a statute that leaves murder as at the common law undivided into degrees. Bishop, who maintains the doctrine laid down in the cases of *Fouts v. State,* and *State v. McCormick, supra,* in his work on Criminal Procedure (vol. 2, p. 586), uses the following language: 'The result is that, according alike to the principles of the common law, to those principles of natural reason and justice which are inherent in the case, and to the provisions of state and national Constitutions, the indictment for murder, where the statute divides it into two degrees, should, if murder of the first degree is meant to be proved against the prisoner, contain those allegations which show the offense to be in this degree. * * * If murder in the second degree only is to be proved, then in all cases an indictment for murder, drawn in any of the common-law forms, will be adequate. Thus it is with the two degrees of felonious homicide which we now call murder and manslaughter'—the only degrees known to our statute. From these considerations we are

clearly of the opinion, and so hold, that the indictment in this case is sufficient."

In the case of *People v. Enoch,* 13 Wend. (N. Y.) 164, 27 Am. Dec. 197, the Supreme Court of New York passed upon this question. The statute then in force in New York defining murder was substantially the same as ours. The indictment in that case did not follow the language of the statute, but charged that the defendant committed the murder "feloniously, wilfully, and of his malice aforethought." The defendant was convicted and sentenced to be hung. He appealed, and the Supreme Court held that the conviction should be sustained. The case was then taken, by writ of error to the Court for the Correction of Errors. The court for the Correction of Errors sustained the conviction on this indictment, and among other things said:

"One object of our Revised Statutes was to get rid of those technical difficulties that had so justly been complained of as a disease of the law, which, without being necessary for the protection of any substantial right of the accused, had so frequently entangled justice in the net of form; and this object of the Legislature will certainly be best promoted by adhering to the common-law form of indictment in cases of murder, the nature of which offense has not been materially changed in the revision of the laws."

In the case of *People v. Giblin,* 115 N. Y. 197, 21 N. E. 1062, 4 L. R. A. 757, the Supreme Court of New York said:

"The defendant was convicted at a court of oyer and terminer, held in and for the city and county of New York, of the crime of murder in the first degree for the killing of Madeline Goelz. From the sentence of death pronounced upon him he has appealed to this court, alleging various grounds in support of his appeal. The indictment was drawn in common-law form, and in one count charged the killing to have been done wilfully, feloniously and with malice aforethought. The defendant objected that such an indictment was not sufficient to sustain the conviction of the defendant for the offense of murder in the first degree while engaged in the commission of the felonious assault upon Valentine Goelz. He argues that the offense is denied by the statute in the alternative, as consisting of separate acts, and the indictment should have stated the circumstances constituting the offense, according to the third alternative provision of section

183 of the Penal Code, which makes the killing of a human being murder in the first degree when committed, without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, a felony. The objection to the indictment is· untenable. A conviction of murder in the first degree under such an indictment is sustained by proof of a killing in the perpetration of a felony. *People v. Conroy,* 97 N. Y. 62; *People v. Willett,* 102 N. Y. 254, 6 N. E. 301. If the indictment contains a plain and concise statement of the acts constituting the crime, and the proof, as to the manner in which it was perpetrated, brings it within one of the statutory definitions of murder in the first degree, the requirements of the law are sufficiently met. The various statutory changes in the definition of what may constitute the crime of murder have not affected, and have not been held to affect, the ordinary common-law counts in indictments for murder."

In the case of *People v. Osmond,* 138 N. Y. 84, 33 N. E. 740, appellant was convicted of murder in the first degree. In passing upon the case the court said:

"The indictment in this case is in the common-law form, and does not charge the killing to have been done in the statutory language, 'from a deliberate and premeditated design to effect the death' of Mary Osmond. It charges that the defendant killed her 'wilfully, feloniously, and of his malice aforethought,' and it contains no charge that while intending to kill another the defendant killed his wife. Ever since the adoption of the Revised Statutes, it has been held without interruption that an indictment for murder in the common-law form was proper, and that under it the people might prove any case which amounted to murder under the statute, and, if the proof did not bring the case within some one of the statutory definitions of murder, it was the duty of the court to give proper instructions to that effect to the jury, and, unless it appeared that the court had failed so to do upon request, the appellate court would presume that the proper instructions were given. *Fitzgerrold v. People,* 37 N. Y. 413, citing *People v. Enoch,* 13 Wend. (N. Y.) 159 [27 Am. Dec. 197], and *People v. White,* 24 Wend. (N. Y.) 520; *People v. Conroy,* 97 N. Y. 62; *People v. Giblin,* 115 N. Y. 196 [21 N. E. 1062, 4 L. R. A. 757]. Under this indictment, it was, therefore, proper to prove any facts which would show the defendant guilty of murder, as defined in any portion of the statute."

In the case of *People v. Sullivan,* 173 N. Y. 122, 65 N. E. 989, 63 L. R. A. 353, 93 Am. St. Rep. 582, appellant was convicted of murder. The indictment against him was in the common-law form. The appellant contended that, under such an indictment, the trial court could not submit to the jury the issue as to whether or not the homicide had been committed while the accused was engaged in the commission of or attempting to commit a felony, but the court held that under such an indictment the prosecution might prove any facts which would bring the case within any of the provisions of the statute defining the offense.

In the case of *State v. Foster,* 136 Mo. 655, 38 S. W. 722, the Supreme Court of that state said:

"The indictment charges that the murder was committed in the attempt to rob Atwater, but such statement was wholly unnecessary, as the indictment may be drawn in common form, and then when proof is made that the homicide was done in the perpetration of a robbery, this proof being made is tantamount to that premeditation, deliberation, etc., which otherwise are necessary to be proven, in order to constitute murder in the first degree. *State v. Hopkirk,* 84 Mo. 278; *State v. Meyers,* 99 Mo. 107 [12 S. W. 516]; *State v. Donnelly,* 130 Mo. 642, [32 S. W. 1124]. But the unnecessary statement aforesaid did not vitiate the indictment. Enough was stated outside of the matter in reference to the robbery, which made the indictment good, but we do not approve of the unnecessary averment."

In the case of *People v. Giblin,* 115 N. Y. 196, 21 N. E. 1062, 4 L. R. A. 757, the Court of Appeals of New York held:

"An indictment for murder in the first degree, which charges that the killing was done 'wilfully, feloniously, and with malice aforethought,' is sufficient, under Pen. Code N. Y. sec. 183, which makes the killing of a human being murder in the first degree, when committed, without a design to effect death, by one engaged in the commission of a felony, and a conviction thereunder is sustained by proof of a killing while in the perpetration of a felony."

Seventh. Counsel complain that the death penalty should not have been assessed in this case. As the evidence amply supports the verdict, we have no right to interfere. The law provides that the jury may in their discretion affix the penalty of

death. This is not only the human law, but is also the divine law. The thirty-first, thirty-second, thirty-third, and thirty-fourth verses of the thirty-fifth chapter of the Book of Numbers are as follows:

"31. Moreover, ye shall take no satisfaction for the life of a murderer, which is guilty of death: but he shall be surely put to death.

"32. And ye shall take no satisfaction for him that is fled to the city of his refuge, that he should come again to dwell in the land, until the death of the priest.

"33. So ye shall not pollute the land wherein ye are: for blood it defileth the land: and the land cannot be cleansed of the blood that is shed therein, but by the blood of him that shed it.

"34. Defile not therefore the land which ye shall inhabit, wherein I dwell: for I the Lord dwell among the children of Israel."

The tenth, eleventh, twelfth, and thirteenth verses of the nineteenth chapter of Deuteronomy are as follows:

"10. That innocent blood be not shed in thy land, which the Lord thy God giveth thee for an inheritance, and so blood be upon thee.

"11. But if any man hate his neighbor, and lie in wait for him, and rise up against him, and smite him mortally that he die, and fleeth into one of these cities:

"12. Then the elders of his city shall send and fetch him thence, and deliver him into the hand of the avenger of blood, that he may die.

"13. Thine eye shall not pity him, but thou shalt put away the guilt of innocent blood from Israel, that it may go well with thee."

From these passages of Scripture it is seen that under the divine law no discretion was allowed and every murderer was condemned to suffer death, while under human law the jury at their discretion may inflict death or imprisonment for life.

Appellant is guilty of a double crime, viz., both highway robbery and murder. One of the citizens of Oklahoma, while quietly and peaceably pursuing his way on one of the public streets of Oklahoma City, was first assaulted and robbed, and, because he called for help, he was brutally murdered. These facts fully

authorized and justified the jury in inflicting the death penalty. We are not unmindful of the awful circumstances which surround appellant, but we are also mindful of the fact that upon the proper enforcement of the law depends the safety of the lives of the people of Oklahoma, and, under the facts and circumstances in this case, we do not feel that we have a right to disturb the verdict.

We listened attentively to the oral argument made in behalf of appellant, and have carefully examined all of the propositions so ably and zealously presented in the brief of his counsel. We have also considered all of the authorities cited by counsel for appellant, and we have been unable to find any reasonable ground upon which the judgment of the lower court should be interfered with. The judgment of the lower court is, therefore, in all things affirmed.

The time originally appointed for the execution of appellant having passed, it is ordered that the judge of the district court of Oklahoma county execute a warrant in due form of law, attested by the clerk of the court under the seal of said court, and to be delivered to the sheriff of said court, commanding said sheriff to execute appellant, James Holmes, between sunrise and sunset on Friday, January 19, 1912, in accordance with law and the judgment of said court heretofore rendered.

DOYLE, J., concurs. ARMSTRONG, J., dissents.

---

ON MOTION FOR REHEARING.

PER CURIAM. On the 8th day of January, 1912, a motion for rehearing was denied in this cause. Counsel for appellant now ask to be allowed to file a motion for reconsideration upon the following grounds:

"(1) That said judgment and sentence of death is inconsistent with Act Cong. Jan. 15, 1897, c. 29, 29 Stat. 487 [U. S. Comp. St. 1901, p. 3620], which in certain cases abolishes capital punishment.

6 Cr.—19

"(2)    That the case of *Holmes v. State of Oklahoma* is practically identical with the case of *Motes v. United States,* 178 U. S. 458-465 [20 Sup. Ct. 993, 44 L. Ed. 1150] in which Mr. Justice Harlan construes said act of Congress, and holds that it is paramount to the low of Alabama prescribing the punishment for murder in the first degree by death.

"(3)    That section 3 of said act of Congress of January 15, 1897, reads as follows:

"'Section 3.    That the punishment of death prescribed for any offense specified by the statutes of the United States, except in sections 5332, 1342, 5339, and 5345, Revised Statutes, is hereby abolished, and all laws and parts of laws inconsistent with this act are hereby repealed.'

"The sections of the United States Revised Statutes construed by the United States Supreme Court in *Motes v. United States, supra,* were 5508 and 5509 [U. S. Comp. St. 1901, p. 3712], and are not within the exceptions enumerated in said act of Congress."

The statutes of the United States and the decision of the Supreme Court of the United States in the case of *Motes v. U. S.,* 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150, have no application at all to proceedings in a state court, but are limited entirely to cases in the United States courts.

The motion filed for a reconsideration of this case is therefore denied.