## E. E. JONES v. STATE.

No. A-1731.  Opinion Filed January 25, 1913.

(129 Pac. 446.)

1.  **CONTINUANCE—Grounds—Necessary Allegations.** (a) An ap-
plication for a continuance is addressed to the sound discretion
of the trial court, and a conviction will not be reversed upon
the ground that the continuance should have been granted, unless
it clearly appears from the record that the court abused its dis-
cretion in this respect.

(b) A defendant is not entitled to a continuance, as a mat-
ter of right, to secure cumulative testimony. If special reasons
exist why a continuance should be granted to obtain this class
of evidence, these reasons must clearly be set out in the applica-
tion for a continuance.

(c) For an application for a continuance, which was insuffi-
cient, on account of the absence of witnesses and the sickness of
one of the counsel for appellant, see opinion.

2.  **JURY—Disqualification—Opinion.** (a) Before a juror is dis-
qualified on account of an opinion, it must appear that the opinion
is fixed and is such as will combat the evidence and resist its
force. A mere impression as to the guilt or innocence of a de-
fendant, where it appears to the court that a juror can and will
disregard such impression and be governed entirely in arriving at
a verdict by the testimony of the witnesses and the instructions
of the court, will not disqualify such juror.

(b) Where there is nothing in the record to show that an
incompetent, disqualified, or otherwise objectionable juror was
forced upon the defendant, this court will not consider an assign-
ment of error based upon the ruling of the trial court on a chal-
lenge for cause.

3.  **INDICTMENT AND INFORMATION—Homicide—Murder—Con-
viction of Manslaughter.** (a) Where an indictment or informa-
tion charges that a murder was committed with a premeditated
design to effect the death of the person killed, or of some other
person, a conviction can be had for manslaughter in the second
degree.

Cr. 8—18

(b)  The various classifications made in our statutes on the subject of felonious homicide were never intended to, and do not, establish so many different rules of pleading.  Their purpose is to mitigate the hardships of the common law and to furnish rules to guide the trial judge in the admission of evidence and in his instructions to the jury.

**4.    APPEAL**—Conviction of Lesser Offense.  (a)  When a defendant is on trial for murder, and the jury, under proper instructions, find him guilty of manslaughter in the second degree, this court will not grant a new trial upon the ground that the defendant should have been either convicted of murder or manslaughter in the first degree or acquitted.

(b)  The jury have the absolute right to fix the degree of a crime of which a defendant is convicted when the court submits to them the different degrees, and this court will not disturb their verdict upon the ground that they have found the defendant guilty of a less degree of offense than that which the evidence establishes.

(Syllabus by the Court.)

*Appeal from District Court, Beckham County;*
*G. A. Brown, Judge.*

E. E. Jones was convicted of manslaughter in the second degree, and appeals.  Affirmed.

J. C. Baker, a practicing physician at Sayre, examined the wounds of John Thurmond, the deceased, shortly after he died on April 23, 1910.  The examination disclosed three gunshot wounds, one on the right arm just above the elbow, and two through the body, one about a half inch to the right of the breast bone, between the fourth and fifth ribs, and the other just to the right of that, about an inch or so.  The bullets were lodged just beneath the skin in the back, and witness cut them out.  They were pistol bullets.  They went straight through the body, about on a level, and did not range much to the left or right.  The wounds caused his death.  The body was warm when the examination was made.

R. B. Brittain was present at Thurmond's barn at the time when the homicide occurred.  Witness was standing on the sidewalk in front of the barn when Jones and Shorty Myers became involved in a difficulty.  The latter cursed defendant, and Jones hit him, knocking him down.  Myers then ran around the barn and entered it again, saying to Jones, "Now, I will get you, you

son of a bitch," and Jones grabbed him by the collar and the seat of his pants and butted him against the wall. Thurmond came in then and told them to stop and to get out of his place of business. Jones then rushed for his gun and fired. Witness saw Thurmond enter the barn, but did not notice any pistol or gun on him. He did not appear angry when he demanded that Jones and Myers get out of his barn.

J. B. Carson was with defendant on the Sunday of the killing, from 9 o'clock to near 12 o'clock, which was about the time the homicide occurred. Defendant then had a pistol.

John A. Stitzler was present at Thurmond's barn at the time of the difficulty—about 12 o'clock. About 30 minutes before the shooting, defendant called to Thurmond to come into the office of the barn, that he had some business with him. Thurmond, Moon, and witness went in. Defendant then held out a bottle of whisky in one hand and pointed a gun at Thurmond with the other and asked him which he wanted. They all took a drink, except Thurmond. Shortly afterwards the difficulty between defendant Jones and Shorty Myers occurred. Witness caught Shorty in his arms to separate them, and Jones hit at him again, missing him, but hitting witness. Witness told him to stop; that he would make Shorty quit bothering him. Defendant then told witness that if he had anything to say they could settle it pretty quick. About then Thurmond came up and told Jones to get out of the barn, that he wanted to raise nothing but trouble there, and he wanted him to get out. Jones then pulled his gun and told Thurmond, "It is your next move, God damn you, get in the road." Thurmond tried then to draw his gun from his pants pocket, but had only the handle of it out, when Jones fired. Jones shifted his position then to the office door, but Thurmond remained where he was. Both of them, meanwhile, were shooting. Jones' gun snapped twice. Jones threw up his hands saying, "I am hit," and staggered as though he were about to fall. Thurmond dropped his hands and said, "Well, I guess I have got him too." Jones staggered through the door and threw his hand against the door and pulled himself around, then, seeing Thurmond, he quickly raised his gun and shot again and shot through

a crack in the office door and hit Thurmond. Witness saw the death look in Thurmond's face, and saw him staggering, and he turned away. When he looked again, he was lying upon the sidewalk.

W. J. Moon testified to practically the same facts sworn to by Stitzler as occurring up to the time when the shooting commenced. He left the barn at that time.

C. H. Cope was near the barn when he heard shots. He went over there and found deceased lying at the front door. Defendant was standing a few feet from the door, with a gun in his hand, which witness took from him. There were two cartridges in it and three empty hulls. The cartridges had been snapped on, but they failed to fire.

Alex. Watson testified in behalf of appellant that he was in a restaurant just across the street from Thurmond's barn when the shooting commenced. He went to where he could see the difficulty. Thurmond was a little south and west of the door, about six feet from the office door. Just after he saw a man go into the office, Thurmond shot into the office door. Then two shots came out of the door. After Thurmond fell he saw Jones standing near him with his gun in his hand.

William Poindexter testified in behalf of appellant. His testimony is substantially the same as that of Watson.

Roy Dunbar testified in behalf of appellant that he was near the barn when the shooting began; heard about seven shots. The second shot was louder than the first.

C. H. Bogard testified in behalf of appellant that he was in the restaurant; heard about seven shots; the second was louder than the first; saw Jones come out of the office door; just as Jones started into the office, Thurmond shot twice, then Jones shot twice at him.

T. S. Combs testified in behalf of appellant that he ran a shop east of the stable and also of Jones' place of business. Jones had pawned his pistol with him, and on the morning of the homicide redeemed it. It was not loaded when he redeemed it. Did not keep his place of business open on Sunday. Jones came there and wanted to redeem his pistol, so witness let him have it.

E. E. Jones, the appellant, testified in his own behalf that he ran a restaurant in Sayre, knew deceased, was friendly with him, never had any previous difficulty with him. About 9 o'clock of the day of the difficulty, defendant went to Thurmond's stable and while there took a drink with deceased and Shorty Myers. Did not then have his pistol. Went by the second-hand store and got his pistol and tried to sell it to Mr. Carson. He passed Thurmond's barn about noon. When Shorty Myers accosted him in insulting language, a difficulty between them ensued, in which defendant shoved Shorty to the ground. Thurmond came over and caught Shorty and they went out of the barn; after a few minutes Shorty returned and began cursing defendant. The latter caught hold of him and they both fell to the floor. Thurmond had returned and was standing there watching them. John Stitzler then placed his hand on defendant's shoulder and said, "John, don't do that"; and just about then Thurmond said, "You God damned son of a bitch, cut that out"; and as he said that he drew an automatic gun from his pocket and fired at defendant from his hip. Defendant jumped to the south and fired, then fell. Thurmond then shot at him a second time, and, as defendant jumped up and started for the office door, he fired again. Defendant went into the office and closed the door, and Thurmond shot at him through a crack in it. Then defendant shot Thurmond twice. He fell, and his gun fired as he fell.

Defendant was charged twice before with an assault to murder, and, upon its being reduced to assault, he pleaded guilty to the charge. Was also charged with robbery and pleaded guilty to a misdemeanor. He pleaded guilty also to aggravated assault once in Sherman, Tex.

Horace Gaither testified in rebuttal for the state to contradictory statements made by defendant's witness Alex. Watson.

John C. Hendrix, county judge, testified in rebuttal for the state that Poindexter, defendant's witness, told him at the time of the inquest that he knew nothing whatever of the facts of this case.

Gene Steele testified in rebuttal for the state to having heard Poindexter make this statement.

Ed Lewis, another member of the coroner's jury, testified in rebuttal for the state that he heard Poindexter make such statement.

*Charles E. McPherren* and *Charles B. Cochran,* for appellant.

*Smith C. Matson* and *Joseph L. Hull,* Asst. Attys. Gen., for the State.

FURMAN, J. (after stating the facts as above). First. At the August, 1911, term of the district court of Beckham county, an information was filed against appellant charging him with the crime of murder. On the 23d day of November thereafter, the case was reached for trial, and appellant filed a motion for a continuance on account of the absence of Vic Vorhees, Frank Morgan, T. M. Beavers, and S. Slater, who were alleged to be material witnesses for the defendant, and also upon the ground of the sickness of one of his local attorneys. Attached to the motion for a continuance, and made a part thereof, were the subpoenas which were issued by appellant for the absent witnesses. The subpoena for Vic Vorhees was issued on the 20th day of November; the subpoena for Frank Morgan was issued on the 15th day of November; and the subpoenas for Beavers and S. Slater were issued on the 10th day of November, 1911. The subpoenas for Vic Vorhees, Beavers, and Slater were returned, "Not found." The subpoena for Frank Morgan was returned, "Served on the 15th day of November, 1911." It is nowhere alleged in the application for a continuance that the testimony of the absent witnesses was not cumulative and could not be obtained from any other source.

This court has repeatedly held that a continuance will not be granted to allow a defendant to obtain merely cumulative testimony, unless some special reason exists therefor. See *Bethel v. State, ante,* 126 Pac. 698; *Litchfield v. State, ante,* 126 Pac. 707. When this case was tried, it appeared from the testimony introduced that, if the absent witnesses had been present, their testimony would have been only cumulative. We think the showing is also insufficient upon the question of diligence.

In the case of *Musgraves v. State,* 3 Okla. Cr. 423, 106 Pac. 545, this court said:

"No reason is given why process was not procured for the witness at an earlier date. The law requires diligence in these matters. A defendant cannot sit still and wait until just before his trial before he begins to get ready for trial. He must be diligent; and if special reasons exist upon which a reasonably prudent man would rely, which would cause him to fail to exercise the utmost diligence, he must state these reasons in his motion for a continuance as an excuse for not having exercised the utmost diligence. No such reasons are stated in the motion in this case. Continuances are not granted as matters of favor or convenience. Defendants must learn that it is a very serious matter to violate the laws of Oklahoma, and that, when they are charged with such conduct, they must be diligent in preparing their defense."

So far as the sickness of one of the appellant's local attorneys is concerned, the record shows that appellant had the benefit of the services of one of the ablest criminal lawyers in the state as leading counsel, and that he also had the assistance of local counsel. The record nowhere shows that appellant suffered any injury on account of the overruling of the motion for a continuance. An application for a continuance is addressed to the sound discretion of the trial court, and a conviction will not be reversed upon appeal unless an abuse of this discretion is shown.

Second. Appellant complains in his brief that the court erred as to the qualifications of two of the jurors in holding them to be competent, and that thereby appellant was forced to exhaust two of his peremptory challenges on said jurors. An examination of the record does not show any error in the ruling of the trial court upon this question. Two of the jurors, when examined on their *voir dire,* did state that they had received impressions about the case from what they had heard, but that they had not talked to any witnesses in the case; that what they had heard was a mere matter of rumor and would not in any manner influence them in considering the evidence; and that they could and would, if taken on the jury, disregard all such impressions and be governed alone by the testimony of the witnesses

and the charge of the court in making up their verdict. Before a juror is disqualified on account of impressions he may have with reference to a case, it must appear that he has such an opinion as will combat the evidence and resist its force. See *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300; *Scribner v. State,* 3 Okla. Cr. 601, 108 Pac. 422, 35 L. R. A. (N. S.) 985. In the case of *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, this court expressly held, in an opinion by Judge Doyle, that an opinion to disqualify a juror must be a fixed one and not a mere impression. This is the law as we understand it. Otherwise it would be impossible to obtain intelligent jurors in the trial of criminal cases. We therefore think that the court did not err in the ruling on this question. But, even if it be conceded that the court was in error on this question, we could not grant a new trial on this account, because there is nothing in this record to show that appellant suffered any injury therefrom.

In the case of *Colbert v. State,* 4 Okla. Cr. 500, 113 Pac. 558, Judge Doyle, speaking for this court, said:

"Where there is nothing in the record to show that an incompetent, disqualified, or otherwise objectionable juror was forced upon the defendant, this court will not consider assignments of error based upon the rulings of the court upon a challenge for cause."

Third. A number of questions presented in the brief of counsel for appellant may be considered under the general objection that, where a defendant is charged with homicide committed with a premeditated design to effect the death of the person killed, or of some other person, a conviction cannot be had for manslaughter in the second degree. Under these various assignments of error, counsel for appellant has discussed at great length and with signal ability all of our statutes upon the subject of felonious homicide, and also the statutes of many other states of the Union. If the views contended for by counsel for appellant were recognized by this court, indictments and informations for murder would become almost as complicated and confusing as a Chinese puzzle, and the very objects for which our statutes were enacted would be defeated. Where an indictment

or information charges a defendant with murder committed with a premeditated design to effect death, and alleges the means with which the homicide was committed, and identifies the transaction which resulted in the killing, this sufficiently informs the defendant of the accusation against him and enables him to prepare for his defense. As murder committed with a premeditated design to effect death constitutes the highest character of felonious homicide, and as the greater necessarily includes all of its several parts, the charge that the homicide was so committed includes all of the lesser degrees of this offense, and a conviction may be had for any of said lesser degrees. The various classifications included in our statute upon the subject of felonious homicide were never intended to, and do not, establish so many different rules of pleading. Their purpose was to mitigate the hardships of the common law and to furnish rules to guide the trial judge in the admission of evidence and in his instructions to the jury. If this were an open question, we would discuss it at length, but the views expressed by counsel for appellant have already been fully discussed by this court, and these previous decisions will be treated as final upon these questions. See *Rhea v. Territory,* 3 Okla. Cr. 230, 105 Pac. 314; *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300; *Byars v. State,* 7 Okla. Cr. 650, 126 Pac. 252; *Turner v. State, ante,* 126 Pac. 452; *Fritz v. State, ante* 128 Pac. 170.

Fourth. It is contended by counsel for appellant that, under the evidence in this case, appellant should either have been convicted of murder or manslaughter in the first degree, or that he should have been acquitted. We cannot recognize this as a ground for setting aside this verdict. Mr. Bishop's New Criminal Procedure, sec. 596, is as follows:

"The jury have the absolute power to fix the degree, as, if in the opinion of the court, which it should state for their guidance, the evidence proves, however conclusively, the first degree, they can still return a verdict for the second. The defendant has no ground of complaint. Of course the proofs must establish murder of one sort or the other."

For a full discussion of this question, see *Warren v. State,* 6 Okla. Cr. 1, 115 Pac. 812, 34 L. R. A. (N. S.) 1121.

We are of the opinion that the testimony in this case would sustain a verdict of either murder or manslaughter in the first degree, but as the jury in charity for the weakness and faults of human nature, or through sympathy for the prisoner or for some other mistaken reason, have seen fit to convict him of manslaughter in the second degree, we cannot disturb the verdict on this account, although we are of the opinion that he should have been convicted of a higher degree. The error was in favor of appellant, and it is one of which he cannot in justice be heard to complain.

The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG,. P. J., and DOYLE, J., concur.