## MONTGOMERY JONES v. STATE.

No. A-3010. Opinion Filed March 22, 1919.

(179 Pac. 619.)

1. **WITNESSES—Codefendant—Competency.** As long as a defendant remains charged with a crime, he is a competent witness only at his own request; therefore, when the state introduced a codefendant as a witness, it was not error to permit the state 'to show that whatever disqualifications might have existed to such witness had been removed, and that such codefendant was competent at that time to testify in behalf of the state against his codefendant.

2. **WITNESSES—Province of Jury—Credibility of Witnesses.** The jury is the sole judge of the credibility of witnesses, and any matter tending to prove that a witness may or may not have an interest in the outcome of the trial is proper to be elicited for the consideration of the jury.

3. **HOMICIDE — Murder in First Degree—Conviction—Statute.** Where an information charged a defendant with murder under the first subdivision of section 2313, Rev. Laws 1910, a conviction may be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute.

4.    **SAME—Abandonment of Conspiracy—Liability for Crime.** It is too late for one, who voluntarily agrees to enter into a criminal conspiracy to rob in conjunction with another, whom he knows to be armed with a deadly weapon and intends to use same to accomplish his purpose, to attempt to escape criminal responsibility for the natural results of such an unlawful conspiracy perpetrated by his codefendant, upon the ground that, after he had seen that death would likely result from said attempted robbery, he abandoned the preconceived purpose by running away from the scene of the tragedy.

5.    **SAME—Murder in First Degree—Evidence.** Record examined, and **held,** that the defendant had a fair and impartial trial, that the evidence is fully sufficient to sustain the verdict rendered, and that an intelligent and honest jury could arrive at no other conclusion than that of the guilt of the defendant.

*Appeal from District Court, Okmulgee County;*
*Ernest B. Hughes, Judge.*

Montgomery Jones was convicted of manslaughter in the first degree, and sentenced to serve a term of 30 years in the penitentiary, and he appeals. Judgment affirmed.

Montgomery Jones, plaintiff in error, was jointly informed against with one Rochester Scott, charged with the murder of one Zealous Wilson, in Okmulgee county, Okla., on or about the 22nd day of January, 1916. The defendants were separately tried; Scott being tried first, convicted of murder, and sentenced to imprisonment for life. Jones was found guilty of manslaughter, and sentenced to imprisonment for 30 years. The circumstances surrounding the killing are substantially as follows:

Zealous Wilson, the deceased, was a negro porter in a pool hall in the city of Okmulgee, conducted by a man by the name of Jackson, which was evidently a bootlegging joint. Jackson was in the habit of having his whisky shipped to the town of Schulter, on the railroad, six or eight miles south of the city of Okmulgee. The codefendant Scott had worked for Jackson, and knew of his habit

of having whisky shipped to Schulter. Scott also knew that the negro porter generally took a horse and buggy and went after the whisky, as he (Scott) had ofttimes done. Some two days before the killing, Scott learned that Zealous Wilson was going to Schulter on the night of January 21, 1916, to procure a consignment of whisky for Jackson. Scott conceived the idea of holding up Wilson and relieving him of the whisky at a point on the public road between the town of Schulter and the city of Okmulgee, about two miles south of the city of Okmulgee, where the dirt road passed through a trestle on the railroad right of way. Scott indicated his purpose to his codefendant, Montgomery Jones, and Jones agreed to go with him. They were also accompanied by another negro by the name of Albert Williams, who went down as far as the trestle and stayed with the other two parties for 30 or 40 minutes, and afterwards returned to Okmulgee. The night was cold, and Williams said he did not want to be engaged in any shooting scrape; and he returned to Okmulgee after Scott had told him in the presence of Montgomery Jones that there would be some shooting take place, and that, if Wilson did not give up the whisky, he (Scott) intended to kill him.

Scott, as a witness for the state, denies any intention or purpose on his part to kill Wilson, but says that he shot over his head, and for the purpose of scaring him, so as to make him run and abandon the buggy load of whisky. Jones says that he thought there was to be no shooting, that they were simply to yell, "Halt! halt! halt!" at Wilson, and, if he did not run, that he and Scott were then to run themselves. The story told by Jones is very improbable, and bears the earmarks of being fabricated, because it was hardly to be presumed that a man who was desper-

ate enough to take a 45 Colt's revolver for the purpose of robbing another of whisky would abandon such purpose after having merely commanded his victim to halt.

It is admitted that Scott at least fired three shots, one of which took effect in the body of Zealous Wilson when he was seated in the buggy, and caused his death. George Wilson, the brother, was with Zealous at the time, and testified that both parties who were under the trestle fired shots at them. It is clear, however, from this record, that it is immaterial, so far as the question of the guilt of Jones is concerned, whether he fired a shot or not. He had full knowledge of what was going to occur beforehand, and voluntarily entered into the scheme to rob Wilson, with the knowledge that Scott was armed, and would use a deadly weapon to accomplish his purpose, if necessary.

After Wilson was shot, his body fell out of the buggy, and George Wilson jumped out of the buggy and ran away. The horse came on up the road, passing both Scott and Jones. They got together again, and walked back to Okmulgee along the public highway. Near the outskirts of the city they came across a suit case filled with bottles of whisky, which had evidently fallen out of the buggy. This whisky the defendants carried to the home of one Booker, another negro, who was a cousin of Scott's. They got there about 5 o'clock in the morning, and proceeded to drink freely of the whisky. Scott left, and went to Nance's rooming house in Okmulgee, where he went to bed, and was arrested about 9 o'clock that day. Jones went to bed at Booker's. He awoke about 10 o'clock. At 11 o'clock he was informed that Wilson had been killed at the trestle south of town. Booker then told him he wanted him to take that whisky away from his house. Jones immediately gathered up four quarts of the whisky, about 12 o'clock,

and took to his heels. Jones was arrested in Henderson county, Tex., about the 22d day of April following, a period of 90 days after the commission of the homicide. He was immediately returned to Okmulgee, placed in jail; and afterwards tried and convicted, from which conviction he has appealed to this court.

*Wm. S. Peters* and *Wallace & Stephens,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is contended that the court erred in permitting the state, in its direct examination of the witness Rochester Scott, a previously convicted codefendant, to show by said witness that he had theretofore been convicted of murder growing out of this particular transaction, and had been sentenced to serve a term of life imprisonment in the penitentiary therefor. Counsel for defendant contend that it was error to permit the state to impeach its own witness.

There seems to this court to be a sufficient reason for permitting the state to show, by the witness Rochester Scott, his status as an accomplice to the crime. Being a codefendant, had the cause still been pending against him, in other words, if he was still a party defendant to the action, he was a competent witness only at his own request. Section 5881, Rev. Laws 1910. Also said Scott would have been entitled to a discharge from the information before he could have been compelled to be a witness for the state, had the charge still been pending against him. Section 5879, Rev. Laws 1910.

However, having been theretofore convicted, and judgment and sentence having been pronounced against

him on said conviction, he thereby became a competent witness, either for the state or his codefendant, and could have been compelled to testify for either party. It was competent, therefore, as we view it, for the county attorney to show by a *voir dire* examination of the codefendant that at that time said codefendant was a competent witness against the defendant then on trial.

As long as a defendant remains charged with a crime, he is a competent witness only at his own request; therefore, when the state introduced a codefendant as a witness, it was not error to permit the state to show that whatever disqualifications might have existed to such witness had been removed, and that such codefendant was competent at that time to testify in behalf of the state against his codefendant.

It having been shown by the state that the witness Rochester Scott was, by reason of his previous final conviction, a competent witness against his codefendant, the objection urged that it was error to permit the state to impeach its own witness is not applicable, because the state was entitled to show that the codefendant was a competent witness to be used against the defendant on trial, and it was entirely proper to show the lack of interest of said codefendant in the result of the trial as affecting the credibility of the witness, a matter peculiarly within the province of the jury. Had counsel for defendant desired, he could have subjected the codefendant to a cross-examination as to whether he was testifying under any promise of reward or hope thereof, and the fact that his conviction of the crime of murder growing out of this particular transaction was admitted by said codefendant did not tend in any way to prejudice this defendant, for the reason that the codefendant testified to no facts favorable to this de-

fendant. From any viewpoint, therefore, this assignment of error is wholly without merit.

It is also contended that the court erred in overruling defendant's motion made at the conclusion of the state's case to direct the jury to return a verdict of not guilty, which request for a directed verdict was renewed at the conclusion of the evidence by a requested instruction to that effect. It is advanced in support of this contention, first, that there was a fatal variance between the allegations of the information and the proof on the part of the state. The information charged the defendant with the crime of murder committed with a premeditated design to kill the deceased, Zealous Wilson, which constitutes murder under subdivision 1, sec. 2313, Rev. Laws 1910.

Defendant contends that the proof on the part of the state only supported murder within the definition of subdivision 2, sec. 2313, *supra*, which provides homicide to be murder "when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." This contention is without merit. In *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, it was held:

"Where an indictment or information charges a defendant with murder under the first subdivision of the statute (Rev. Laws 1910, sec. 2313), a conviction can be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute."

It may be noted in this connection also that the conviction against this defendant was for manslaughter in the first degree, and that there is no contention whatever but that the information is a sufficient charge of murder, and

such a one as would include manslaughter in the first degree and support a conviction thereof.

Secondly, it is contended that the defendant "took no part in the killing," and "it is hard to conceive how one could be held as a coconspirator when the act was done was contrary to, and against the intention, advice, and expressed request of the defendant; for the evidence shows that defendant told said Scott not to shoot, and when contrary to that demand Scott fired one shot, defendant left him, showing that he did not aid, abet, or even consent to the shooting."

Only the evidence of the defendant will support any such conclusion. It is too late for one who voluntarily agrees to enter into a criminal conspiracy to rob, in conjunction with another whom he knows to be armed with a deadly weapon and intends to use same to accomplish his purpose, to attempt to escape criminal responsibility for the natural results of such an unlawful conspiracy perpetrated by his codefendant, upon the ground that after he had seen that death was likely to result, he attempted to abandon the preconceived purpose by running away from the scene of the tragedy.

One who voluntarily enters into a conspiracy to rob with another, whom he knows intends to use a deadly weapon for that purpose, and aids and abets such other person in carrying out said conspiracy up until the shooting commences as part of the act of robbing, and then flees, is in no position to claim that the jury was not justified in holding him criminally responsible for a death that was the direct result of such shooting.

If parties defendant could escape criminal responsibility upon such a specious defense as this, then there would be very little likelihood of convicting any other than

the person who fired the fatal shot in homicide cases, although the crime may have been the result of a conspiracy on the part of numerous others also.

Counsel for defendant have requested the court, in view of the fact that the defendant prosecutes this appeal as a poor person, and also because of the heavy punishment imposed, to carefully examine the record for errors not urged in the brief filed. The court has, in response to said request, taken particular pains to carefully examine the entire record in connection with every ground urged in the motion for a new trial, and it is clear that a fair and impartial trial was afforded defendant in this case. Also it may be here said that the evidence in the case is sufficient to have authorized the jury to return a murder verdict, and there is nothing in the record to indicate that an intelligent and honest jury would arrive at any other conclusion than that of the guilt of the defendant were a second trial to be had.

For the reasons stated, the judgment of conviction is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.