## FRANK WARE v. STATE.

No. A-7468. Opinion Filed March 8, 1930.
Rehearing Denied June 5, 1930.
(288 Pac. 374.)

Tillman, Tillman & Pierson, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter called the defendant, was by information charged with the crime of murder, was tried and convicted, and his punishment fixed at imprisonment in the state penitentiary for life. Motion for new trial was filed, considered, overruled, and the defendant duly excepted, and has appealed to this court.

The charging part of the second amended information upon which the defendant was tried, omitting the caption, is as follows:

"That on or about the 2nd day of October, A. D. 1928, in said county of Kay and state of Oklahoma, one Frank Ware, then and there being, did then and there unlawfully, willfully, knowingly and feloniously and without the authority of law and with the premeditated design to effect the death of one Carl Snodgrass, did operate, drive and propel an automobile motor vehicle upon, against, into and on the body and person of the said Carl Snodgrass; said automobile being operated, driven and propelled by the said Frank Ware, and the said Frank Ware did then

and there in the manner aforesaid with said automobile inflict upon the body and person of the said Carl Snodgrass mortal wounds of which he the said Carl Snodgrass did languish and lanquishing did die on the 2nd day of October, 1928; the said Frank Ware in the manner and form as aforesaid, did then and there and thereby knowingly and feloniously kill and murder the said Carl Snodgrass."

A demurrer was interposed by the defendant to the second amended information, which demurrer was by the court heard and overruled, and the defendant duly excepted. A jury was impaneled, and when the state called its first witness, the defendant objected to any testimony on the ground that the information upon which the defendant was called for trial wholly failed to state an offense against the laws of the state of Oklahoma, which objecttion was overruled, and defendant excepted. The defendant then objected to any testimony concerning the possession of intoxicating liquor or the drinking of intoxicating liquor by the defendant Frank Ware, for the reason and upon the ground that the same is incompetent, irrelevant, and immaterial. The information failing to allege said homicide was committed while the defendant was committing a felony, and driving and propelling a motor vehicle upon the public highway while in an intoxicated condition, and requests that the said objection be permitted to lie to the testimony of all witnesses introduced on behalf of the state in reference to the above-stated particular matter, the court overruled the objection to this extent: That the court will permit the state to offer evidence on that subject, but the court would not at this time permit said objection to be made to each question, and overruling the same because each specific question, or some of the specific questions may be asked in a way that the same may be incompetent, irrelevant, and immaterial,

and the court will not pass upon any specific objection until the question is asked, or the objection made. To the ruling of the court the defendant duly excepted.

The state then called Guy La Rue, who testified:

"I was acquainted with Carl Snodgrass during his lifetime; I lived at Denoya, Okla.; I am acquainted with Frank Ware; on the night of October 2, 1928, about midnight, Carl Snodgrass and I was on the Kaw City road on a motorcycle going east on our return from a trip out west; about midnight a car approached us coming from the east, we were going east and the car was coming west; Carl was driving the motorcycle and I was riding in the side car; when I first saw the lights on the car I judge it was a quarter of a mile away; I did not pay any attention to it then; I judge it got within 50 yards and then it drove right across the road toward us; the car glanced the side of our motorcycle and knocked us off in a ditch and killed Carl instantly; the car that struck our motorcycle was a Studebaker sedan; there were four occupants in the car; after we were struck I jumped out of the side car and hollowed, 'Carl.' He did not answer me and I went around to the side car and looked down at him, his face was all smashed in, and I could see he was dead. Immediately I ran down to the car that had struck us and asked them to take us to a Doctor; I made them get out of the car and I saw the boys staggered when they walked; the car stopped about 100 yards down the road from where it struck our motorcycle; the car as it came meeting us was on the north side of the road until it got within 50 yards or so, and then it just came over toward us. It angled right across the road from the north side to the south side of the road next to the ditch; when I first met the occupants of the car between the car and where the accident occurred, I said, 'My God, you have killed a boy down here,' and Frank Ware wanted to know if anybody was hurt. I told them again they had killed a boy down there, and he asked me two or three times if anybody was hurt; he staggered when he walked, his head swinging backwards and forwards; I was not excited at the time;

the defendant, Frank Ware, was to the best of my knowledge intoxicated at the time his car struck our motorcycle; I judged his condition from the smell of his breath, and his stagger as he walked, and repeated questions. When I met these folks they went back to where Carl was, and Jack Morris wanted to see the boy and he put his arm under Carl and lifted him up along side the motorcycle; and then came back up, and I went and laid him down again; I didn't want him sitting up like that, he was dead. Hazel Wampler, Elizabeth Bighart Madison, Jack Morris, Frank Ware and myself were present at the time of this conversation; soon after that Amos Crane and a girl with him from Oxford, Kan., came up, and immediately after that Bill Hall, from Shidler, came up. These two cars arrived about the same time; I asked Amos if he would not go and call an ambulance. The defendant was present at the time I had this conversation with Amos. I asked who was driving the car and one of the girls said Frank was driving the car. I asked Frank if he would take the car and take Carl to the hospital, and I don't know which one, but one of them went back and said he could not start it, and one of them said he did not want to drive it with a flat anyway. Just after that when Amos came up and I asked if someone would take us to the hospital right now. I don't know who answered, it was a man's voice; I don't know whether the defendant offered any assistance or not; one of the men went down and tried to start the car and said he could not; I examined the car and found the left fender and running board was turned and bent down all along, and the left fender was bent down; the left rear fender was curled under the left rear wheel, and the left rear wheel was flat. The whole side of the motorcycle was stripped, and one of the bars broke loose from the side car; at the time the motorcycle was struck it was on the outside of the road as close to the edge as it could get; the road was about 30 feet wide at this point. The car struck the motorcycle a glancing lick went off the side of the road and the car went on down the road; I remained in the side car until it hit; Carl Snodgrass fell with the motorcycle into the ditch and rolled off the side of it. This was in Kay county, near an underpass between Kaw

City and Ponca City; I don't know how long the defendant stayed there after the accident; he left but I don't know where he went; he was not there when the ambulance came; Elizabeth Bighart Madison and Jack Morris remained there; there was no intersection or cross section of roads in or about the scene of the accident; it was a moon light night."

On cross-examination the witness stated he had never seen the defendant, Frank Ware, before the night of the accident:

"The first time I saw the light of the car coming toward us it was about a quarter of a mile, I judge something like that, the car was driving fast, about 35 or 40 miles; I testified in the preliminary trial that the car was driving 35 or 40 miles, I don't know which; I don't remember for sure, I might have said 35 miles. I know I said 35 or 40 miles; I don't know how fast this car was coming, it approached rapidly, I could not give you an estimate of how fast it was coming from the time I first saw the light until it struck us; this car swerved in toward us when it was about fifty yards from us—it angled across to our side of the road—it was something like fifty yards, I could not say just how far it was, but that is my best judgment. It was farther than from me to the end of the courtroom; I fixed the speed of the car by general knowledge of the speed of cars and the distance it went after it crashed; Frank said he applied his brakes. We had a headlight on the motorcycle; I did not hollow to Snodgrass, nor did I speak to him; we were on the right side of the road; I am certain we were up against the right hand side of the ditch, on the south side; I do not know what caused the car to swerve toward us; the car first struck about where the left-hand fender is on the car; it was a glancing lick and tore most of the running board off, and two handles off the door; it was not a head-on collision, it was a glancing lick; they were driving about 35 or 40 miles; we were going about 25 or 30; when I got out of the wreck I went to where the parties were and told them a boy had been killed; Frank Ware, the defendant,

was drunk; the reason I think he was, he staggered when he walked, and he repeatedly asked me if somebody was hurt; if the defendant was hurt I did not know it; I can tell the jury that Frank was drunk. I don't know whether he was injured or not, nor do I know what it was he was drinking. I have talked with full-blood Indians; Frank would just say a word or two, and finally he would say another word, but he did not hold a conversation."

Witness was then asked the following questions and gave the following answers:

"Q. You do not have the very kindest feeling for him? A. No, you naturally wouldn't feel that way toward a man who had killed your buddy.

"Q. I am just asking you how you feel, I don't think you did. You say after that Frank came back? A. Yes.

"Q. And you talked to him there didn't you? A. Out at the scene of the accident."

"After that he disappeared a little while after the accident; the girls in Frank's presence told me Frank was drinking and he did not deny it."

Hazel Wampler, a witness, testified in substance that she knew the defendant Frank Ware; she saw him on or about the first day of October, 1928, at Pawhuska, Okla., about 7:30 in the evening—

"I was with Elizabeth Bighart Madison that evening; the defendant Frank Ware, Jack Morris, Elizabeth and myself went to Ponca City; before leaving Pawhuska the boys bought a quart of whisky; Frank paid for it, it was in two pint bottles; I think it was Rye whisky; we went from Pawhuska to Ponca City; we were on the road about an hour and a half; we drank all the whisky that had been purchased before we left Pawhuska; I don't remember how many drinks were taken, I did not count them; Frank Ware was driving the car, it was a Studebaker sedan; when we got to Ponca City we went to the Grand Rooms; I don't know whether the defendant drank anything at the Grand

Rooms or not, but there was a bottle in the room while we were there; I imagine we stayed about an hour; we had one bottle, I think two bottles each of beer at the roadhouse; the defendant drank some while we were at the roadhouse; we stayed there about 30 minutes; while we were at the roadhouse there were two pints of whisky purchased; we talked of going to Tulsa, and we were trying to get on the road to Pawhuska; when we left the roadhouse Elizabeth was drunk and so was Jack Morris; I really believe that Frank Ware was not as bad as they were; he had quite a bit; I don't know what road we were on when we left the roadhouse; we stopped the car somewhere and asked a lady if she could tell us the road to Pawhuska, and she said we were on the Kaw City highway; we were then intending to go to Pawhuska; I don't know what you would call it, I don't know whether the motorcycle struck us or we struck the motorcycle; when I looked up I saw a flash of light and heard a crash; the motorcycle was traveling east; I did not observe the motorcycle prior to the crash; the defendant, Frank Ware was driving the car; I don't know how fast we were driving, but I imagine about 35 miles an hour; they were coming pretty fast; there were no remarks just prior to the accident as to what speed he was making; just before this accident we were about the center, more to the south than to the north, of the road; I imagine the road at that point was about 35 or 40 feet wide; it was a smooth road; the car went down the road about 200 yards before it stopped; I think the defendant applied the brakes and stopped the car; I saw the body of Carl Snodgrass; he was dead, because I got down there by him, and then I told Guy La Rue to feel and see if his heart was beating and it wasn't; the motorcycle was over by the side of Snodgrass in the ditch on the south side of the road; the front fender to the Studebaker in which we were riding was bent and the back tire was down; that was about all I noticed; I don't know how long the defendant remained at the scene of the accident; we were not there when the ambulance came; when we left we started out across the field; we must have walked in a circle in the field, because we came out not far from the scene of the accident; when

we got out to the road we saw a car coming, and I ran out and flagged it, and it was three officers from Ponca City; the defendant was picked up there by the officers; I remember starting across this field, and some one following us and wanting us to come back; and I told him to go back and get Elizabeth, and we waited for them under a tree, and they did not come and we walked on; I don't know whether the tire was down prior to the accident or not."

On cross-examination the witness was asked where she lived in September, 1928, and answered: In Wichita, Kans.; that she knew Elizabeth Bighart Madison, of Pawhuska, and she was down there visiting with her—

"Elizabeth and I were going down the street to a picture show and met Jack Morris, and he made a date with us to go on the drive; I don't know who it was mentioned the whisky, but when we got in the car something was said about some whisky, and Frank Ware bought it; I don't know whether Frank gave Jack the money or not; we sat there parked on the street until the man went and got the whisky; I took four drinks, and Frank took more than I did; the quart of whisky was all consumed before we got to Ponca City; I did not see Frank take any whisky at the Grand Hotel; when we got to the roadhouse I drank what I thought was spiked beer, and Frank drank a bottle; Frank had two bottles; I did not taste the one he drank, but the beer I drank was spiked; we then bought two more pints of whisky; I don't know whether Frank drank out of these two bottles or not; I took the corks out and threw the bottles away. Elizabeth and Jack were both intoxicated when we were on the Kaw City highway; to the best of my knowledge this accident occurred about 12 or 1 o'clock; I did not see the motorcycle before the car struck it; Elizabeth sat in the front seat with me; I was holding her head up; I just looked up and saw a flash of light; it was just about that time the collision occurred; I imagine we were driving about 35 miles an hour. Frank Ware was not speeding or driving recklessly; at the time of the accident the automobile was in the middle of the road. It was on the center, not very much to the north. The

center of the front fender was struck; I mean the left-hand fender. The motorcycle side-swiped the automobile and hit the left fender and tore the running board loose and knocked the door knobs off and knocked down the back fender; I don't know whether it knocked the defendant over against me or not; it threw Elizabeth against the windshield; I went back to the scene of the accident and found the boy was dead; Guy La Rue was just like a hysterical woman; he said he didn't know how he could ever tell Carl Snodgrass' mother about it; he tried to get us to turn the car around and take the boy to the hospital; I don't know whether it was Frank Ware or Jack Morris that told him the car wouldn't run; Frank started through the field after the man and woman came; we went over in the field and hunted around and was trying to find a way to reach Pawhuska."

On redirect examination the witness stated: "I don't know how much time we spent walking in the field; we did not intend to get back in the road; we thought there was another road over there, another highway." Witness was then excused, and Guy La Rue was recalled and asked if he was nervous or excited, and answered, "No, sir." The witness Hazel Wampler was then recalled by the state and asked if, on the morning of October 2d, at the time the Studebaker sedan and motorcycle collided, was Frank Ware was under the influence of intoxicating liquor? Which was objected to, and the objection overruled, and exceptions saved. The witness answered:

"Well, he was feeling pretty good.

"Q. Well, would you say at the time of the accident he was under the influence of intoxicating liquor?"

This question was objected to, and the objections overruled and exceptions saved.

"Answer. Well, yes, he was a little. It was about 30 minutes prior to the accident that we were at the farmhouse and inquired about the road."

Here the court questioned the witness:

"Q. Was he at the time under the influence of intoxicating liquor? A. When?

"Q. At the farmhouse? A. Slightly.

"Q. What were his actions there that would indicate that? A. Well, as I said before, he staggered a little when he got out of the car."

Witness further stated that at the roadhouse at 11 o'clock, in Ponca City, the evening prior to the accident in the early morning, the defendant was under the influence of intoxicating liquor. On cross-examination, the witness was asked who she was talking to since yesterday concerning the case about changing her testimony, and answered, "I have not changed it." And then stated she talked to Mr. Harder a little this morning—"he told me that yesterday I stated Frank was pretty full when we left the—well, he was not exactly what you would call drunk, but he was under the influence of intoxicating liquor when he left the roadhouse, and he said when the defendant's counsel cross-examined me, I changed my testimony."

"Q. Did he tell you what he would do to you if you did not testify again this morning? A. Get me for perjury. Said he would prosecute for perjury.

"Q. That is the reason you got back on the stand, to keep from being arrested for perjury, is that true? A. Yes.

Elizabeth Bighart Madison testified in substance to the same facts as did Hazel Wampler, with reference to their getting together in the town of Pawhuska, and as to the quantity of whisky consumed, and as to their going to the Grand Rooms in Ponca City, and the roadhouse, and starting home from the roadhouse. The witness then stated, in reply to questions of the court, that she was so

drunk she did not know what the condition of the defendant and the other parties were at the time they left the roadhouse until the accident. Witness stated that when they left the Grand Rooms they were all feeling good.

On cross-examination witness was asked about her getting drunk and as to the quantity of whisky they had consumed from the time they left Pawhuska until the time of the collision. Witness stated she did not know whether Frank and Hazel were sober when they reached Ponca City or not—"they were as drunk as we were, and that was pretty drunk; I saw Frank Ware take a drink up at the Grand Rooms; I don't know how many he drank; we all had a drink at the Grand Rooms excepting Hazel; at the beer joint we all had a bottle of beer and that is about all I remember; I passed out completely, and I don't remember."

Howard Johnson testified on behalf of the state that he was in the county attorney's office at the time of the accident, and that the defendant Frank Ware made a statement, after it had been explained to him that the statement might be used against him, in which statement he said that he and Jack Morris, Elizabeth Bighart Madison, and Hazel Wampler, when they started from Pawhuska, drank what whisky they had before they got to Ponca City, and detailed in substance the same facts as the witness Hazel Wampler and Elizabeth Bighart Madison testified to as to their drinking the whisky, what occurred at the Grand Rooms in Ponca City, and as to what took place at the roadhouse where they got the home-brew. Witness Johnson also visited the scene of the accident and testified as to the marks of the car as to where they were when the accident occurred.

A. C. Midcaff and Ivan Webb testified they were at the scene of the accident and saw where the car had been

stopped, and that the Studebaker car tracks at the scene of the accident were about two feet from the south side of the highway. Ivan Webb stated he could see the general direction from the south side of the embankment where the accident happened up to the time the car stopped; that it angled back to the center of the highway and stopped almost in the center—"we went back up the road about 40 or 50 yards east of where the accident occurred, and the car track showed the car had been driving mostly on the south side of the pavement, or road; the car track showed it had started in this general southernly direction toward the motorcycle east of a point of the accident 40 or 50 yards, something like that; I could not tell as to whether or not both tires were inflated; I could see the track of the motorcycle just prior to the point the collision occurred, and the track of the side car was plumb off the road, and the motorcycle was just barely on the edge of the highway; the motorcycle would not have had to have gone south more than a foot and a half to have been off in the ditch." Witness further stated he was with the officers when they found the defendant out in the field near the road.

Fred Long, an undersheriff, testified in substance to the same facts as did Ivan Webb. Several other witnesses testified as to the position of the car, and seeing the tracks, All of the witnesses stating that where the accident occurred the automobile driven by the defendant showed to be on the south side of the road.

The defendant called as a witness John Shipley, who testified he lived in Ponca City at the time of the accident, October 2, 1928; he saw the defendant at the Grand Rooms in company with Elizabeth Bighart Madison, and two other parties; he talked with the defendant that night and he was sober. On cross-examination he stated that he was

not in the room when the bottle of whisky was passed around to the different parties—"I did not have much conversation with him, just asked him how he was; I was busy playing checkers; I was an intimate friend of his brother, who is now deceased; I live at the Grand Rooms."

Byron Weston testified he was in Ponca City about 10:30 or 11 o'clock, and saw the defendant at a filling station on Second street, and talked with him, and "if he was drinking I could not tell it; he did not act that way. On cross-examination stated defendant Frank Ware was sitting in an atuomobile; there were four people in the car; the car was headed toward Pawhuska, which was east.

Laura Shipley was at the Grand Rooms the evening of October 1, 1928. She testified she had known Frank Ware always; "when the defendant came to the hotel and went into a room I was not out there; I saw him and talked with him that night, and to my knowledge he was sober." On cross-examination witness stated she lived at the Grand Rooms—"I do not know when he came up the stairs, nor when he went into the room in the kitchen; I was out in the lobby; when I was in the lobby I guess he was in this room; I just spoke to him that was all; I did not have any conversation with him."

The defendant, testifying in his own behalf, stated: He was born December 6, 1906; he had known Hazel Wampler two years; and Elizabeth Bighart Madison a long time; had known Jack Morris about four years; he met Jack Morris on the streets of Pawhuska and later met Hazel Wampler and Elizabeth Bighart Madison—

"We made a date with them to go riding; I borrowed a car, and before we left town I bought a quart of whisky; I paid for it; Jack Morris gave the bootlegger the money; I drank whisky four or five times between Pawhuska and

Ponca City; Jack and Elizabeth drank more of it than Hazel and I; the whisky was all gone by the time we got to Ponca City; I did not drive recklessly or carelessly; was driving about 35 miles an hour; we arrived in Ponca City about 10 o'clock and went to the Grand Rooms; Elizabeth wanted to see Mrs. Shipley; we got something to drink up there; there was some whisky up there, and I drank just one small drink; we left the hotel about 10:30; I saw a fellow known as Jazz-boy down at the filling station, in the next block from the Grand Rooms; I was not drunk at that time; from Ponca City we went to a beer joint for the purpose of getting something to drink; I don't know who suggested it, but some one in the crowd did; we got some beer; I think it is intoxicating; I drank one bottle and I think the rest of them did the same; it did not make me drunk, nor did it make me feel under the influence of intoxicating liquor; we stayed at the beer joint a little better than a half hour; then we started for Pawhuska; we left there about 12 o'clock; Mrs. Wampler was not drunk; Elizabeth and Jack were drunk; we got lost over there on one of the roads and went and asked some one where we were; we were told we were on the Ponca City-Kaw City highway; we started to Ponca City; I was not driving over 30 or 35 miles on hour; I was perfectly sober at the time; when I saw the motorcycle I imagine it was about 100 or 175 yards on the left-hand side of the road, on its own side; it was on the south side of the road; my car was on the north side of the road; I was going west and the motorcycle was coming east; when I got in about 45 feet of the motorcycle, the left rear tire went down; I felt it going down and tried to stop, and kept going over; I seen the wreck coming, I turned to the right, tried to get back on the right side of the road, and after the accident happened I finally got back over there; at the time of the accident there were three of us in the front seat; I did not intend to run over anybody that night; I was sober at the time; after the accident I stopped my car just as soon as I could and got out and went back to see what had happened; Hazel and I got out and went back there; when I got out and went

back I saw a boy coming toward us; the boy I learned afterwards was Guy La Rue; he asked me if I could take this boy to town, he was hurt; I said, I'll see; I went back to the car and got the kids out and came back up to the wreck and asked if there was anybody hurt; and he said yes, the boy was badly hurt; he asked who was driving the car, and I said I was; then I told Jack to let's see if we could get the tire fixed, and we went back and got the jack out of the car and was jacking it up when the other car came; I did not try to start the car; Jack tried to start it, I was looking at the fender and tire, and I told the boy I had a flat; I remember the car coming up; I did not pay much attention to it; I don't remember Blanche Parks that testified this morning; when the car drove up the La Rue boy went over to the window; I did not go over, nor did I talk to the people, I just saw the car; we just waited around there awhile and Jack went back down there and looked at the boy; he was lying right off the culvert somewhat curled up in there; I only asked the boy what had happened one time; I left the car and went straight toward Ponca City over there; we were going to town; we did not think of anything then, we started to go across the field; we got back off in a creek down there and got lost, and we could see the lights coming and going over there and started back to the road; Hazel Wampler said she was going to stop this car; I said all right, and she stopped the car, and it was the sheriff and some one, I don't know who it was, and they arrested me. From the time we left Ponca City until they arrested me, I was not under the influence of intoxicating liquor, nor was I drunk; I used every means in my power to avoid this accident when I had this blow-out or flat tire; I did not intend to hurt this boy; had never seen him before; never heard of him before."

On cross-examination he stated he was not quite 21 when the accident occurred—

"I used to go to school with Elizabeth Madison; I don't know when she got married; I knew her husband; I did not know Mr. Wampler; I was going to military

school in Missouri, I started in September; after I got out of jail at Newkirk, I went back to school. I borrowed my sister's car and went and got these two girls; we got some whisky before we started on the trip; I took a drink from the bottle that was passed around; at the Grand Rooms I talked with Charley Choteau; I mentioned the names of all the persons I remembered seeing at the Grand Rooms; at the Grand Rooms there was a sewing machine or table covered with a blanket; when I asked Hazel where the bottle was, she said it was under the blanket right back on the table, or sewing machine: I took a little drink and put the bottle back in the same place. I don't know whose liquor it was; all of us but Hazel took a drink; I did not take quite a half inch out of the bottle. We stayed there better than a half hour; we were not in the lobby; we were in a room; I don't know whose room it was, nor do I know who engaged the room; that is where Elizabeth went and I followed her in there; Elizabeth is all I remember being in the room; I think Elizabeth knew Laura at the Grand Rooms; about all I said to Charley was to ask how he was getting along, and asked how he was doing; Elizabeth suggested that we leave the hotel and get a drink; we did not drink all the liquor in the bottle; I don't know why we did not drink all of it; I was out in the lobby at the Grand Rooms when I was first offered a drink, but I do not know who offered it to me; I only saw the bottle come when I drank out of it; Jack and Hazel were in there when I took a drink; Hazel is the one that told me where the bottle was; Elizabeth Madison was drunk when we were in the Grand Rooms; some one helped Elizabeth down the stairs when we left; I got in the driver's seat, and Hazel was riding in the same seat; we went around by the filling station and went back out east of Ponca City to a joint where we got some beer; none of the Shipley family was in the car with us; I did not drink more than one bottle; I did not put any alcohol in it; we did not remain at the beer joint more than an hour; we intended to go home when we left; Elizabeth got in the front seat and Jack was in the back seat; I drank about every time the bottle was

passed from the time we left Pawhuska until we got to the Grand Rooms; I did not eat anything after we left Pawhuska; I had eaten my supper about 6:30; I bought two pints of whisky at the beer joint; I don't remember telling Howard Johnson I had taken six drinks and was feeling pretty good, possibly I did; the only effect the drinks had on me was to burn my throat; when I drink the first feeling I have is feeling funny all over, on this occasion I did not feel funny; Elizabeth and Jack drank out of the quart I bought at the beer joint; they passed out back on the road when Elizabeth got over in the front seat; Jack went to sleep; Elizabeth was drunk and wallowing around in the front seat; we only traveled a short distance from the beer joint when they took another drink; I could not see how far; I got lost because I did not know the road.

"Q. Why did you happen to be going north if you were perfectly sober? A. I turned at some road.

"Q. You don't know what road? A. No.

"Q. Did you think you were going back to Ponca City then? A. No, sir.

"Q. What did you think? A. We just got lost, out there, that is all.

"Q. You were perfectly sober then? A. Yes.

"Q. All the time you intended to go back to Ponca City? A. For a while there I was afraid to go back to Pawhuska.

"Q. Why? A. Because Elizabeth was drunk.

"Q. You did not know the way to Pawhuska? A. Yes, I had been around this other way between Pawhuska and Ponca City.

"I don't remember how far north I went, it was dark; I did not pay much attention to how far we were going, we were going somewhere; I changed my mind from going to Pawhuska and wanted to go back to Ponca City after we left the beer joint; I could not say how far back, three

or four miles, I turned north; I don't know how far I went east from the beer joint; I did not go very far, there were lots of country roads around there and I got all mixed up. I don't remember where we turned back west; no, we were not trying to find Pawhuska when we talked to the woman, we were trying to find where we were, we were lost and did not know we were going toward Pawhuska.

"It must have been a quarter of a mile from the beer joint when Jack laid down and went to sleep; after Elizabeth got up in front she passed out too; this liquor we got at the beer joint was drank before Jack passed out; I did not take any; I did not feel it, I did not drink much of it; when it was purchased the liquor was given to me, and I gave it to Hazel and I think she kept it; I think it was passed around and Elizabeth and Jack took a drink. The liquor that was drank out of the last quart was just before Jack went to sleep; the liquor that was purchased at the beer joint was given to me; when we inquired of the woman about the Kaw City road, she told us to go straight ahead to go to Ponca City; I don't know who the woman was; I could not say how far we drove from there before the accident occurred; we drove quite a ways down the road; up to that time I had not felt any of the liquor; I saw the light of the motorcycle approaching, it had just one light; the motorcycle was on the left side of the road where it ought to be; we were driving around 30 or 35 miles an hour; I don't think we were going 40 or 45 miles; I think we were going around 30 or 35 miles, did not look at the speedometer, no, sir I was not driving briskly; I was driving a Studebaker sedan, I don't know what size tires it had on; I never did look at the tread of the tires, or examine them; where the collision occurred the road was level, just a little bumps; Elizabeth was sitting in the front seat on the outside; Hazel was next to me; something like 40 or 50 feet from the motorcycle I tried to straighten out my car; when the tire went down until I struck the motorcycle I had driven about 35 or 40 feet; I could not say how wide the road was there, just an ordinary road; when the accident occurred, I was on the left-

hand side of the road; I went across the road at an angle of about 45 degrees; I did not hear any report before I hit the motorcycle; I felt the tire going down just before I hit the motorcycle; I just started feeling it go down about 45 feet before the accident; I could not say as to whether it had been down before that or not; it was hard to steer; I did not notice any track; I don't know how near I come to the south side of the road; after the accident the motorcycle was off in the ditch; it was right on the edge of the road; I did not look at the tire track when I went back; after the collision I just went back across there toward the center of the road; I stopped as soon as I could; I went about 75 yards I guess before I stopped; I had gone back to the middle of the road by that time; I examined the back left tire after it was jacked up; it was all cut up; I don't know what cut it; I don't have any idea, it was pushed back underneath some way, the tire was down; I could not get the tire off; up to that time I had not felt any of this liquor; I was perfectly sober; we stopped the car and found Guy La Rue back there; he did not say anything to me; I did not say anything to him; he just got hold of that girl; I don't think he was trying to keep her from seeing the body, he was just excited; I was excited; this is the first excitement I had experienced that evening; when we got back to the body, I looked at it, and he asked me who was driving, and I said I was, and I went back to look at the car and to see what had happened to the car; I did not try to do anything to the boy; he was dead; Jack went down to the body with me; Jack was staggering around pretty drunk; he woke up just after the accident; he was not hurt any; I went down to see what I could do for the boy; I stayed up in the road; I was sober; Jack looked at the boy to see if he could do anything, and said, no, he was too bad hurt; the La Rue boy asked Jack if we could take him to town; he said something about a tire, and that we were all smashed up in the fender. Hazel went down to where the boy was, and then Jack and Elizabeth; I think Hazel took Elizabeth back from the body to the car; I was examining the car; I did not have

a conversation with the occupants of the car that drove up; I was trying to get the car started; if we could we were going to take him to town; Guy La Rue went up to the car that drove up; I never did go over to the car; I don't know whether any one went on with it or not; I did not pay any attention to him; Jack was talking to him up there; I could not say, I did not pay much attention to him, I was trying to see if I could get the car started; Elizabeth Bighart Madison had been up there by the wreck where the accident happened, crying around; she just hollowed and said we killed a boy; I don't remember if she said anything about her husband; she almost fainted; Hazel was taking care of her for a while; they were talking about getting that boy to town; we looked over there, and I said it could not be far from town, so we started to town; when I left the scene of the accident Hazel was with me; I heard Hazel testify that we were to meet the others over under a tree; no, sir, it is not true we were to meet them under the tree; we went across the field, it seemed to me, toward Ponca City; we afterwards went back to the road to pick up a ride; when we started out we did not intend to ride; we started across the field toward a light, but there were too many stickers, and we turned back to the road again; Hazel suggested she was going to flag a car; I was willing that she should do that; we were really going back to the road for the purpose of flagging a car; we climbed over one or two fences in our walk; the field had cuckleburs and stickers; we went through a cane patch and back off a little level plain and then toward the creek; when we stopped at the house to inquire about the road, the woman said we were going toward Ponca City on the Ponca City-Kaw City highway; we knew we were going toward Ponca City; we decided several miles before that to go back to Ponca City. In the preliminary examination I testified I got lost over there and that we were going to Kaw City; that is the way it was; we got lost out there."

The state also called Blanche Parks as a witness, who testified that she was out on the highway where this

collision occurred; that she was going down to the home of Mr. Crane; they were driving in a Star coach; Mr. Crane was with her—

"'We stopped at the scene of the accident; we saw Frank Ware; as we drove up, we stopped the car to keep from running into somebody; as we stopped he sorty reeled up against the car, and Mr. Crane asked him what the trouble was; he said he guessed they had quite an accident there by the culvert, guessed they had killed this boy; the defendant, Frank Ware, made this statement to me and Mr. Crane; at this time I noticed his condition as to being drunk or sober, or under the influence of intoxicating liquors; he did not talk plain, and he staggered around; it was easily understood he had been drinking; I could smell whisky or liquor; from my observations there at the time I would state he was drunk because he could not handle himself properly."

On cross-examination the witness testified, in substance:

"I was going to the home of Amos Crane the night of the accident; his folks lived at Denoya; he was working in Oxford; Amos Crane lived in Denoya, not very far from Main street, I should judge better than a mile from Mr. Snodgrass' home; I was not acquainted with Mr. Snodgrass until this accident, Mr. Crane knew him; I could not say whether they were friendly or not; I was going to the home of Mr. Crane that night at Denoya; we had started from my home at Oxford about 25 minutes to 10 o'clock; I was going to spend the night at Mr. Crane's home; I had not been drinking any that night; the first thing I observed was the car parked across the road; the only interest I have in this case is I am a friend of Mr. Crane and he knew this boy prior to the accident; when we drove up to the scene of the accident, the Indian girl was crying, and fainted several times while we were there; no, I would not say she fainted more than twice; I do know she fainted twice; the white girl was hysterical, and the other boy did not have much to say; he was drunk;

I smelled whisky on him; he was there with the rest of the party."

This being an important case, we have deemed it advisable to set out at considerable length the substance of the testimony.

There are 22 errors alleged to have been committed by the court in the trial of this case. The errors that we deem necessary to consider at length will be considered in the order they are presented by the defendant in his brief. The first assignments of error discussed by the defendant are assignments 11 and 12, which are as follows:

"11. That the court erred in overruling the demurrer of the plaintiff in error to the information filed in said cause.

"12. The court erred in overruling the objection of the defendant to the introduction of any testimony in this cause."

These two assignments are discussed jointly in the defendant's brief, and we will consider them jointly, as they in substance relate to the same question, the sufficiency of the second amended information, being the information upon which the defendant was tried and convicted. The charging part of which information has been set out in the first part of this opinion: 1. The demurrer of the defendant was that the information does not state sufficient facts to constitute any offense against the laws of the state of Oklahoma. 2. That the said information was duplicitous and uncertain in its terms. 3. That said information is not drawn in the language of the statute.

Section 2555, C. O. S. 1921, defines the requisites of the indictment or information. Section 2556, C. O. S. 1921, requires that the indictment or information be certain and direct. Section 1733, C. O. S. 1921, defines mur-

der, and divides in into different degrees. The question raised by the defendant on his demurrer is: Does the information state facts sufficient to advise the defendant of the crime charged against him and sufficiently apprise him of what he must be prepared to meet? If it does, it is good as against the demurrer. The information charges that the defendant unlawfully, willfully, knowingly, and feloniously, and without authority of law and with the premeditated design to effect the death of one Carl Snodgrass by operating, driving, and propelling an automobile motor vehicle upon, against, into, and upon the body and person of the said Carl Snodgrass, said automobile being operated and propelled by the said Frank Ware. Then charges the defendant with inflicting mortal wounds upon the body of the said Carl Snodgrass, from the effects of which wounds he died.

It is urged by the defendant that this information does not state facts sufficient to charge the defendant with the crime of murder. An examination of the record shows that the defendant had a preliminary examination, and that later the information was filed in the trial court, which was demurred to by the defendant; the demurrer was sustained and an amended information filed; and the defendant in substance filed the same demurrer to the amended information that he had filed to the first information, which demurrer to the amended information was overruled and defendant duly excepted. The defendant has urged at length the question of the allegations in the information, but from an examination of the record it would seem that the greater part of his argument is leveled at the proof that was introduced in the trial of the case, and not at the allegations in the information. In other words, considerable time is taken up by the defendant in his argument discussing the question that there

is no allegation in the information charging the defend-
ant with driving an automobile or doing anything evin-
cing a depraved mind, and that the information does not
contain an allegation charging the defendant with driv-
ing a car while intoxicated. This particular objection
urged by the defendant relates more directly to the proof
offered by the state in the trial of the case than to the
allegations in the information. A careful study of the
information discloses that it sufficiently charges the crime
of murder in clear and concise language, and that the
demurrer of the defendant was properly overruled, as well
as the general objections made to the introduction of any
testimony as to the defendant's condition at the time of
the killing, as to being under the influence of intoxicating
liquor. The general objection made at the time was pre-
mature. Any objection to the admission of testimony
should be made at the time offered. The trial court could
not indulge in speculation as to what testimony would be
offered or of its admissibility until it had been offered.
It was not error for the court to overrule the general ob-
jection of the defendant at the time made.

The information stated facts sufficient to put the de-
fendant upon his trial for murder. The question raised
by the defendant in this case has been before this court
several times, and the court has specifically held that the
accused may be charged with the crime of murder alleged
to have been committed with premeditated design to effect
death under the first subdivision of the statute, and a
conviction had under the proof of killing, in the com-
mission of a felony as proved under the third subdivision
of the statute. Under the holdings of this court the
pleader may charge a crime under the first subdivision of
the statute, and prove the offense under either of the other
subdivisions of the statute. In passing upon this ques-

tion this court said that said subdivisions of the murder statute were not intended to create different kinds or different degrees of murder, but merely to establish the facts which, if proved, make out the crime of murder.

In Holmes v. State, 6 Okla. Cr. 541, 119 Pac. 430, in the sixth paragraph of the syllabus, this court said:

"(a) Where an indictment or information charges a defendant with murder under the first subdivision of the statute (Snyder's Comp. Laws 1909, § 2268), a conviction can be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute.

"(b) Our statute defining murder was intended to simplify the law upon the subject, and make it plain and bring it within the common understanding of the citizens of the state, and it does not prescribe a rule of pleading, but it establishes a guide to the conduct of the trial prescribing the proof requisite to a conviction."

In Fritz v. State, 8 Okla. Cr. 342, 128 Pac. 170, Holmes v. State, supra, was cited with approval. Decisions to the same effect are Jones v. State, 8 Okla. Cr. 576, 129 Pac. 446; Jones v. State, 15 Okla. Cr. 547, 179 Pac. 619; Agent v. State, 18 Okla. Cr. 292, 194 Pac. 233.

The defendant next discusses errors 7 and 8, which are as follows:

"7. That the verdict of the jury and judgment of the court is contrary to law.

"8. The verdict of the jury and judgment of the court is contrary to the evidence."

Under these two assignments the defendant presents the question that there is a disagreement and variance between the allegations in the information and proof offered at the trial, and the defendant argues that it is the fundamental law in a prosecution that the allegations

in the indictment or information, and the proof, must correspond, and that in the trial of this cause no attempt was made on the part of the county attorney to follow the allegations in the information. Upon an examination of the record we find that the information charged that the defendant did knowingly, willfully, and feloniously, without authority of law, and with the premeditated design to effect the death of one Carl Snodgrass, operate, drive, and propel an automobile motor vehicle upon, against, and into the body and person of the said Carl Snodgrass, inflicting upon the said body wounds of which the said Snodgrass died. The testimony in this case conclusively shows that on the morning of October 2, 1928, shortly after midnight, the deceased and Guy La Rue were coming east on the highway between Ponca City and Kaw City, and defendant, together with three other parties, was driving west on the same road; that the car driven by the defendant just before it met the motorcycle on which the deceased and Guy La Rue were traveling turned from its side of the road and struck the motorcycle on which the deceased, Carl Snodgrass, was riding, and killed him. The proof tends to establish every allegation in the indictment as to the driving of the car and striking the deceased, from the effects of which the deceased died.

The chief argument of the defendant is that there being no allegations in the information charging the defendant was under the influence of intoxicating liquor at the time the accident occurred, there was a variance in the allegations and proof. With this contention we cannot agree. The proof of the defendant's condition at the time he was driving the car tended to show that the defendant was under the influence of intoxicating liquor, in fact, that he had been drinking during the evening prior

to the accident and only a short while before the accident had taken drinks; that the defendant's actions at the time of the accident indicated he was intoxicated. We do not think this testimony is such as to show a variance in the proof and allegations, as it only tends to show the condition of the defendant at the time of the collision which took the life of Carl Snodgrass, and that the defendant was driving the automobile on the highway while under the influence of intoxicating liquors. The jury are the sole and exclusive judges of the credibility of the witnesses and the weight to be given their testimony. The testimony, if believed by the jury, was sufficient to warrant it finding the defendant guilty.

The defendant further complains that the court erred in its instructions, in not properly charging the jury, even if they found the defendant under the influence of intoxicating liquor at the time of the accident, they should further find, in order for him to be guilty of murder, that this intoxicated condition was the proximate cause of the injury that resulted in Snodgrass' death; that the court should further define the term "under the influence of intoxicating liquor."

This question of under the influence of intoxicating liquor was before this court in several cases. In the case of Welch v. State, 43 Okla. Cr. 47, 277 Pac. 280, this court said:

"The term 'under the influence of intoxicating liquor' as used in section 3, chap. 16, Session Laws 1923, is a term of common use and requires no definition or explanation to be understood by persons of ordinary intelligence, and it is not error for a court in defining the offense of driving * * * while under the influence of intoxicating liquor to fail to define or explain such term."

This case is cited with approval in the case of Bruce v. State, 46 Okla. Cr. 214, 287 Pac. 809. We have carefully examined the instructions of the court as applied to the facts in this case. Taken in their entirety they substantially cover the law.

The defendant also complains of the misconduct of the county attorney in his argument to the jury. On investigation of the remarks of the county attorney, while they are subject to criticism, they are not of sufficient merit to cause a reversal of this case.

Counsel representing the defendant in this case has ably and earnestly presented every conceivable question they deem prejudicial to the rights of their client, and are to be commended for their earnest efforts in his behalf. In this case the main question is, Did the defendant drive his automobile into and upon the motorcycle on which the deceased was riding, and the manner in which the defendant was operating his car at the time he struck the motorcycle and killed deceased. The defendant in his own behalf attempts to justify the act that one of his casings went down just about the time he met the motorcycle. The other parties in the car with the defendant were in such a state of intoxication they did not know what took place; in fact, they did not know they were meeting any one until the collision occurred. The defendant in his own behalf says that just before he met the motorcycle his car swerved to the south and got on the left-hand side of the road where the motorcycle was being driven, and that he could not control it; that he righted his car and got back in the middle of the road and stopped it about 75 yards from where the collision occurred. The defendant denies that he was intoxicated, but admits they left Pawhuska with a quart of whisky, and after they got to Ponca City, at a rooming house he took another drink;

they went from there to a beer joint, where he drank one or two bottles of beer and where they purchased another quart of whisky, and left the place to go to Pawhuska; they got lost and found they were on the wrong road to get to Pawhuska, and were going back toward Ponca City when the accident occurred. Witnesses who appeared at the scene shortly after the collision testify that the defendant's actions were those of a person intoxicated, and that they smelled liquor upon him.

We think the question as to whether or not the defendant was under the influence of intoxicating liquor at the time of the collision was a question for the jury, under proper instructions of the court, and that the jury decided that question adversely to the defendant. This court has repeatedly held that where there is any competent testimony to go to the jury, though conflicting, it would not disturb the verdict on the ground of the insufficiency of the evidence. The testimony in this case is sufficient to sustain the conviction. The instructions of the court, taken in their entirety, substantially and correctly state the law applicable to the facts in this case. The defendant was accorded a fair and impartial trial.

Finding no fundamental or prejudicial errors in the record, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.